**K & T, INC., a Utah corporation dba Budget Rent–A–Car of Salt Lake; Paul Taylor, individually; and Michael Taylor, individually, Plaintiffs and Appellants,**

v.

**George B. KOROULIS, and Montana Brand Produce Co., Inc., a Utah corporation, Defendants and Appellees.**

No. 930506.

Supreme Court of Utah.

Dec. 16, 1994.

Rehearing Denied Feb. 8, 1995.

Donald J. Winder, Kathy A.F. Davis, Robert D. Tingey, Salt Lake City, for plaintiffs.

Kirk W. Bennett, John C. Green, Kim M. Luhn, Salt Lake City, for Koroulis.

John W. Call, Craig T. Vincent, Curtis C. Nesset, Salt Lake City, for Montana Brand Produce Co.

ZIMMERMAN, Chief Justice:

Plaintiffs K & T, Inc., and Paul and Michael Taylor appeal from the district court's grant of summary judgment in favor of defendant Montana Brand Produce Co. We reverse and remand.

"Before we recite the facts, we note that in reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Higgins v. Salt Lake County*, 855 P.2d 231, 233 (Utah 1993). "We state the facts in this case accordingly." *Id.*

K & T is a closely held Utah corporation which owns and operates a rental-car franchise along the Wasatch Front. On June 30, 1981, K & T, the Taylors, and George Koroulis [1] entered into an agreement ("Stockholders' Agreement") governing any transfer or encumbrance of K & T stock. To prevent outsiders from gaining a right to share in the management of K & T, the stockholders agreed to restrict the transfer or encumbrance of K & T stock. This restriction took the form of a preemptive right on the part of K & T and its stockholders to purchase any K & T stock that a stockholder intended to transfer or encumber.[2] The Stockholders' Agreement specifically provided that all

---

1. Koroulis and the Taylors were the sole stockholders in K & T.

2. The Stockholders' Agreement provides as follows:

   1. *Restrictions During Lifetime of Stockholders.* No Stockholder shall transfer or encumber his shares of capital stock of the Corporation, whether presently owned or to be acquired, to any person, firm or corporation without the consent of the other Stockholders unless the Stockholder desiring to make the transfer or encumbrance (hereinafter referred to as the Transferor) shall have first made the offer to sell, hereinafter described, and such offer shall not have been accepted.

   (a) *Offer by Transferor.* The offer shall be given to the Corporation and to the other Stockholders and shall consist of an offer to sell all the shares of capital stock of the Corporation owned by the Transferor, to which offer shall be attached a statement of intention to transfer or encumber, as the case may be, and the number of shares of capital stock involved, which shall be all of his shares.

   (b) *Acceptance of the Offer.* Within thirty (30) days after receipt of such offer the Corporation may, at its option, elect to purchase all, but not less than all, of the shares of stock owned by the Transferor. If the offer is not accepted by the Corporation within that time, the other Stockholders may, within forty-five (45) days after the receipt of such offer, at their option, purchase on a pro-rata basis all of said shares of capital stock. In the event any one or more of the individual Stockholders fails to purchase all of the shares he is entitled to purchase, such shares shall be available to the remaining Stockholders on a pro-rata basis within ten (10) days additional after such availability. The acceptance by any such Offeree shall be in writing.

stock certificates were to be surrendered to K & T and endorsed with a restrictive endorsement.[3] Nevertheless, no such endorsement was ever placed upon Koroulis' stock certificates.

On August 31, 1990, Bountiful Motor Sales, Inc. ("BMS"), a corporation owned by Koroulis, entered into a financing agreement ("the Dealership Loan") with First Security Bank ("FSB"). At approximately the same time, FSB made a number of personal loans to Koroulis. BMS eventually defaulted on the Dealership Loan, and Koroulis defaulted on his personal obligations. After the defaults, Koroulis, BMS, and FSB entered into a series of forbearance, cross-collateralization, and loan agreements ("the Forbearance Agreements").[4] Pursuant to these agreements, Koroulis and BMS provided FSB with additional collateral for the Dealership Loan, FSB extended additional credit to BMS and Koroulis, all of the loans were cross-defaulted and cross-collateralized, and certain other terms and conditions were imposed on the loans.

As part of the additional collateral provided by Koroulis and BMS to FSB under the Forbearance Agreements, Koroulis executed an agreement under which he pledged to FSB his shares of K & T stock ("Pledge Agreement"). Richard H. Pope, a vice president of FSB, reviewed the Stockholders' Agreement and determined that the consent of the K & T stockholders was necessary for a valid pledge of Koroulis' stock.[5] Pope directed attorneys for FSB to prepare a consent agreement for review and execution by Paul Taylor, then vice president of K & T. After the execution of the Pledge Agreement by Koroulis, Pope met with Paul Taylor on several occasions in an attempt to obtain his consent to the pledge. Paul Taylor refused to sign the first consent agreement, a five-page document prepared by FSB's attorneys.

Pope then directed attorneys for FSB to draft a "simpler" consent agreement, which Paul Taylor also refused to sign. Neither K & T nor the Taylors ever consented to the pledge of K & T stock by Koroulis to FSB.

BMS and Koroulis eventually defaulted on their obligations to FSB under the Forbearance Agreements. Sometime after the default, Koroulis and BMS contacted Montana Brand to request that Montana Brand purchase FSB's interest in the Koroulis and BMS loans. After Montana Brand tentatively agreed to such an arrangement, FSB drafted an agreement by which FSB would sell its interest in the Koroulis and BMS loans, along with the collateral securing those loans, to Montana Brand ("Loan Sale Agreement").

At the time the Loan Sale Agreement was executed, Robert G. Maxfield, secretary of Montana Brand, reviewed FSB's loan file. Although the file did contain a copy of the Pledge Agreement, Maxfield asserted in an affidavit that the file did not contain a copy of either the proposed consent agreements or the Stockholders' Agreement. Discovery conducted after the trial court dismissed FSB from the case reveals, however, that the Stockholders' Agreement and the proposed consent agreements were in the file. Maxfield also asserted via affidavit that "[n]either [he] nor, to the best of [his] knowledge, anyone at Montana Brand was informed of the existence of the Consent Agreement or the Stockholders' Agreement by personnel from First Security [Bank]."

Sometime around May 28, 1992, Montana Brand sent Paul Taylor a letter claiming that Koroulis and BMS had defaulted on their loan obligations and that Montana Brand was therefore the owner of Koroulis' stock under the terms of the Pledge Agreement. In his affidavit, Paul Taylor averred that this letter was the "first information [he received] that

**3.** Paragraph 15 of the Stockholders' Agreement provides for the endorsement of the following restriction upon the stock certificates:

> The transfer of the shares of stock represented by this certificate is restricted under the terms of an Agreement dated June 30, 1981, a copy of which is on file in the office of the Corporation, subject to amendments.

**4.** The first agreement was dated March 28, 1991, a second was dated September 17, 1991, and a third was dated December 2, 1991.

**5.** Each of the individual forbearance agreements provided, as a condition of forbearance, that Koroulis deliver a consent agreement, executed by the stockholders of K & T, consenting to the pledge.

the Pledge Agreement had been executed, or that Montana Brand claimed an interest in [Koroulis'] shares." In response to the letter, Paul Taylor informed Montana Brand that K & T and the Taylors were entitled to purchase the stock for an amount set forth in the Stockholders' Agreement. When Montana Brand declined the request, K & T and the Taylors brought this action against Koroulis and Montana Brand in Utah's Third Judicial District Court.[6]

On April 30, 1992, K & T and the Taylors moved for summary judgment, asking the district court to declare that Koroulis had breached the Stockholders' Agreement and that K & T and the Taylors were entitled to purchase Koroulis' stock as set forth in the Stockholders' Agreement. In response, Montana Brand filed a cross-motion for summary judgment. In its cross-motion, Montana Brand asserted that (i) section 70A–8–204 of the Code[7] rendered the restriction on transfer contained in the Stockholders' Agreement ineffective because the restriction was never endorsed on the stock certificates and Montana Brand took the stock without actual knowledge of the restriction; and (ii) the Taylors and K & T waived the right to enforce the restriction. In response to Montana Brand's cross-motion for summary judgment, K & T and the Taylors argued that section 70A–8–204 applied only to restric-

tions "imposed by the issuer" of the securities. Because the restriction at issue here was agreed to by all of the stockholders rather than imposed by K & T, the effectiveness of the restriction should be measured by reference to section 70A–8–302 of the Code[8] rather than to section 70A–8–204.

At a hearing on June 21, 1993, the district court granted Montana Brand's cross-motion for summary judgment. In so doing, it concluded as a matter of law that section 70A–8–204 was applicable "[b]ecause the Stockholders['] Agreement is actually between K & T and the three stockholders of K & T, [and] the restriction on transfer ... was imposed by the issuer of the stock." Furthermore, relying on the Maxfield affidavit, the district court concluded that Montana Brand took the stock without actual knowledge of any restriction on the transfer of the stock. K & T and the Taylors appeal, claiming that (i) the trial court erred when it relied on section 70A–8–204 rather than on section 70A–8–302 to measure the effect of the restriction on transfer contained in the Stockholders' Agreement, and (ii) even if section 70A–8–204 is applicable, genuine issues of material fact exist which preclude summary judgment.

■ We first state the applicable standard of review. Summary judgment is appropriate only when no genuine issues of material fact exist and the moving party is entitled to

---

6. On August 17, 1992, Montana Brand filed a third-party complaint against FSB, alleging fraud and misrepresentation in connection with the Loan Sale Agreement. Montana Brand claimed that FSB had failed to disclose that the transfer of K & T stock was restricted by the Stockholders' Agreement. FSB moved to dismiss, claiming that Montana Brand had failed to perform due diligence prior to entering into the Loan Sale Agreement with FSB. The district court agreed, stating:

> Montana Brand[] was perfectly free to talk to the stockholders and just as able to do so as [FSB] had been. Where there were no inhibitions placed in the path of Montana Brand[] to do any investigation it wished in regard to the transaction and it failed to make such inquiry it cannot now be heard to complain.

7. Section 70A–8–204 provides in relevant part as follows:

> A restriction on transfer of a security imposed by the issuer, even though otherwise lawful, is

ineffective against any person without actual knowledge of it unless:
> (1) the security is certificated and the restriction is noted conspicuously on the instrument....

Utah Code Ann. § 70A–8–204.

8. Section 70A–8–302 provides in relevant part as follows:

> (1) A "bona fide purchaser" is a purchaser for value in good faith and without notice of any adverse claim:
> (a) who takes delivery of a certificated security in bearer form or in registered form, issued or indorsed to him or in blank;
> . . . .
> (2) "Adverse claim" includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security.
> (3) A bona fide purchaser in addition to acquiring the rights of a purchaser under Section 70A–8–301, also acquires his interest in the security free of any adverse claim.

Utah Code Ann. § 70A–8–302.

judgment as a matter of law. Utah R.Civ.P. 56(c); *Higgins,* 855 P.2d at 235. Because entitlement to summary judgment is a question of law, we accord no deference to the trial court's resolution of the legal issues presented. *Higgins,* 855 P.2d at 235; *Ferree v. State,* 784 P.2d 149, 151 (Utah 1989). "We determine only whether the trial court erred in applying the governing law and whether the trial court correctly held that there were no disputed issues of material fact." *Ferree,* 784 P.2d at 151 (citing *Bushnell Real Estate, Inc. v. Nielson,* 672 P.2d 746, 749 (Utah 1983); *Bowen v. Riverton City,* 656 P.2d 434, 436 (Utah 1982)).

The first question is whether the district court erred when it held that the transfer restriction contained in the Stockholders' Agreement is an issuer-imposed restriction. This is critical because section 70A–8–204 provides that only "[a] restriction on transfer of a security *imposed by the issuer* " is ineffective against any person without actual knowledge unless the restriction is conspicuously noted on the security. (Emphasis added.) If the restriction at issue was not "imposed" by K & T but by the stockholders, section 70A–8–204 does not apply.

■  When faced with a question of statutory construction, we look first to the plain language of the statute. *State v. Larsen,* 865 P.2d 1355, 1357 (Utah 1993); *Schurtz v. BMW of N. Am., Inc.,* 814 P.2d 1108, 1112 (Utah 1991); *Brinkerhoff v. Forsyth,* 779 P.2d 685, 686 (Utah 1989); *see also Bonham v. Morgan,* 788 P.2d 497, 500 (Utah 1989) (per curiam) ("Unambiguous language in [a] statute may not be interpreted to contradict its plain meaning."). In construing a statute, we assume that "each term in the statute was used advisedly; thus the statutory words are read literally, unless such a reading is unreasonably confused or inoperable." *Savage Indus., Inc. v. Utah State Tax Comm'n,* 811

P.2d 664, 670 (Utah 1991). "Only when we find ambiguity in the statute's plain language need we seek guidance from the legislative history and relevant policy considerations." *World Peace Movement of Am. v. Newspaper Agency Corp.,* 879 P.2d 253, 259 (Utah 1994); *see also Schurtz,* 814 P.2d at 1112 ("We first look to the statute's plain language. Only if we find some ambiguity need we look further."); *Brinkerhoff,* 779 P.2d at 686 (holding that if "statutory language is plain and unambiguous, this Court will not look beyond the same to divine legislative intent").

■  While the Code defines the terms "issuer" [9] and "knowledge," [10] it does not define the term "imposed." Common usage of the word, however, is quite clear from other sources. According to Webster's, to impose is "1. To enact or apply as compulsory ... 2. To apply or make prevail by or as if by authority ... 3. To obtrude or force (e.g., oneself) upon another or others." *Webster's II New Riverside University Dictionary* 614 (1984). These definitions contemplate a situation where one is forced to comply with the directive of another. In the context of the present case, the restriction on transfer would be issuer-imposed if it were contained in K & T's charter or bylaws or in a corporate resolution. If such were the case, the stockholders of K & T would have no choice but to comply with the terms of the restriction.[11]

In the case at hand, however, each of the stockholders voluntarily agreed to certain restrictions on their right to transfer their shares of K & T. The mere fact that K & T is a party to the agreement does not change its voluntary nature. Absent the Stockholders' Agreement, K & T would be powerless to control the disposition of any of the shares of K & T stock. Accordingly, we conclude that the restriction at issue here was not "imposed" by K & T. *See also U.C.C. § 8–*

---

9.  Utah Code Ann. § 70A–8–201.

10.  Utah Code Ann. § 70A–1–201(25)(b).

11.  If, for instance, K & T's board of directors proposed and the stockholders of K & T approved a bylaw which mandated that no K & T stockholder could sell his K & T stock unless

those shares were first offered to the other stockholders, that restriction would be imposed by the corporation and would be binding even on those stockholders that voted against the bylaw. *Tu–Vu Drive–In Corp. v. Ashkins,* 61 Cal.2d 283, 38 Cal.Rptr. 348, 348–50, 391 P.2d 828, 828–30 (1964). The efficacy of such a restriction, as against a third party, would be measured by section 70A–8–204.

204 cmt. 6 (indicating that section 8–204 does not apply to "private agreements between stockholders containing restrictive covenants as to the sale of the security").

Montana Brand makes much of the first sentence of the Stockholders' Agreement, which states that it is an agreement "by and between George B. Koroulis, Paul F. Taylor, and P. Michael Taylor, hereinafter referred to as 'Stockholders[,]' . . . individually, and K & T Corporation—Budget–Rent–A–Car, a Utah Corporation, hereinafter referred to as 'Corporation.'" According to Montana Brand, this language indicates that the Stockholders' Agreement "was not merely among the stockholders of K & T but was actually an agreement between the stockholders of K & T on the one side and K & T, the issuer, on the other side." We think that Montana Brand's interpretation of this introductory language is untenable. This language simply indicates that there are four parties to the Stockholders' Agreement, three individual stockholders and K & T. Koroulis and the Taylors are listed together for convenience, because they are each individuals rather than corporate entities, rather than to indicate that they are on one side of the agreement and K & T is on the other.

■ We note that even if we were to conclude that section 70A–8–204 were applicable, it would still be necessary to remand because Montana Brand failed to meet its affirmative burden, as the party moving for summary judgment, of establishing that there were no disputed material issues of fact. *See Lamb v. B & B Amusements Corp.*, 869 P.2d 926, 928 (Utah 1993) ("The party moving for summary judgment must establish a right to judgment based on the applicable law as applied to an undisputed material issue of fact."). Section 70A–8–204 provides that "[a] restriction on transfer of a security imposed by the issuer" is ineffective against any person without actual knowledge unless the restriction is conspicuously noted on the security. Thus, to prevail under section 70A–8–204, Montana Brand must show that there are no disputed material issues of fact regarding its lack of actual knowledge. Unless it does so, the party opposing the motion is under no obligation to demonstrate

that there is a genuine issue for trial. *Id.* at 928; Utah R.Civ.P. 56(e); *cf. Thayne v. Beneficial Utah, Inc.*, 874 P.2d 120, 124 (Utah 1994).

Here, Montana Brand presented a carefully tailored affidavit in which Maxfield testified that "[n]either [he] nor, to the best of [his] knowledge, anyone at Montana Brand was informed of the existence of the Consent Agreement or the Stockholders' Agreement *by personnel from First Security [Bank].*" (Emphasis added.) Montana Brand also submitted an admission on the part of Koroulis that he had never informed Montana Brand about the restriction. These two pieces of evidence do not foreclose the possibility that Montana Brand acquired actual knowledge of the restrictions from some other source. Thus, K & T and the Taylors were under no obligation to come forward with specific facts showing that there was a genuine issue for trial. *Cf.* Utah R.Civ.P. 56(e). Because Montana Brand did not demonstrate its entitlement to summary judgement based on an undisputed fact, summary judgment was inappropriate. *Lamb*, 869 P.2d at 928.

■ Montana Brand argues that even if we find section 70A–8–204 inapplicable, we should still affirm on a ground not relied upon by the trial court: to wit, that K & T and the Taylors waived their right to enforce the Stockholders' Agreement. Montana Brand correctly points out that we may affirm a grant of summary judgment on any ground, even one not relied upon by the trial court. *White v. Deseelhorst*, 879 P.2d 1371, 1376 (Utah 1994); *West v. Thomson Newspapers*, 872 P.2d 999, 1012 n. 22 (Utah 1994); *see also Higgins*, 855 P.2d at 241. "However, any rationale for affirming a decision must find support in the record." *Hill v. Seattle First Nat'l Bank*, 827 P.2d 241, 246 (Utah 1992). We find no support in the record for a grant of summary judgment on the waiver theory.

■ A waiver is an intentional relinquishment of a known right. *Soter's Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 939–40 (Utah 1993). "Waiver requires three elements: (1) an existing right, benefit, or advantage; (2) knowledge of its existence;

and (3) an intention to relinquish the right." *Id.* at 940. The intention to relinquish the right may be either expressed or implied and may be implied from action or inaction. *Id.*

■ Here, summary judgment on the issue of waiver would have been inappropriate because K & T and the Taylors have met their burden under rule 56(e) of the Utah Rules of Civil Procedure to demonstrate that there is a "genuine issue for trial." Paul Taylor testified via affidavit as follows:

At no time did any of the plaintiffs consent to a pledge by Koroulis of his stock to First Security Bank ("FSB"). Although I was approached in approximately March of 1991 by Richard Pope, a representative of FSB, twice in personal meetings (at locations I can't recall) and various other times by telephone, regarding plaintiffs' consent to a proposed pledge by Koroulis, plaintiffs in each instance refused to execute the form of consent agreement submitted by FSB.... Subsequent to March of 1991 plaintiffs had no further contacts with FSB or Koroulis (or anyone else) regarding the pledge.

In fact Koroulis told me subsequently, on two separate occasions, in telephone conversations, not to worry, he didn't need plaintiffs' consents, the first such occasion occurring a day or two after the second proposed Consent Agreement was presented to me (approximately March 28, 1991).

On or about May 28, 1992, I received a letter from counsel for Montana Brand Produce Company, Inc.... In that letter, Montana Brand claims ownership of 15,000 shares of K & T, Inc. stock previously owned by Koroulis. Plaintiffs' first information that the Pledge Agreement had been executed, or that Montana Brand claimed an interest in the shares at issue, came upon plaintiffs' receipt of said letter from counsel for Montana Brand making reference to the Agreement.

Plaintiffs at no time received notice from Koroulis, as required by paragraph 1 of the Stockholders' Agreement, regarding his proposed pledge to FSB and providing plaintiffs a right to exercise their purchase option contained therein.

Accepting Taylor's statements as true, as we must do on appeal from a summary judgment, *Winegar v. Froerer Corp.*, 813 P.2d 104, 107 (Utah 1991), we are led to the inescapable conclusion that genuine issues of fact exist as to whether there was a waiver.

We reverse the grant of summary judgment and remand to the trial court for further proceedings.

STEWART, A.C.J., and HOWE, DURHAM and RUSSON, JJ., concur.