ELM, INC., Plaintiff and Appellee,

v.

M.T. ENTERPRISES, INC., aka M.T. Mechanical, a Utah corporation; and Morris Told, an individual, Defendants and Appellants.

No. 971578–CA.

Court of Appeals of Utah.

Oct. 22, 1998.

Rehearing Denied, Dec. 21, 1998.

Brian Steffensen, Salt Lake City, for Appellants.

John P. Harrington and Sean B.D. Hosman, Ray Quinney & Nebeker, Salt Lake City, for Appellee.

Before Judges BILLINGS, GREENWOOD, and JACKSON

## OPINION

GREENWOOD, Judge:

Appellants M.T. Enterprises, Inc. (M.T.) and Morris Told appeal the trial court's grant of partial summary judgment in favor of ELM, Inc. (ELM) for amounts due under an employee leasing contract executed by the parties. M.T. and Told also appeal the trial court's ruling that a subsequent Payment Agreement signed by the parties was not induced by duress. We affirm on both issues.

## BACKGROUND

M.T. is a Utah corporation engaged in construction work, providing plumbing, heating and air conditioning, and mechanical work. Told is the president of M.T. ELM is a company that provides leased labor and personnel services to its clients in exchange for payment. On September 27, 1994, M.T. and ELM executed a Contract Employee Agreement (the Agreement). In the Agree-

ment, ELM agreed to lease personnel to M.T., to pay each of the leased employee's wages, benefits, insurance, and workers' compensation, and to be responsible for all taxes in exchange for payment to ELM by M.T. of 112.50% of the gross payroll ELM paid the leased employees. The Agreement stated that either party could terminate it at will.

In Paragraph 4 of the Agreement, M.T. agreed "to indemnify ELM from and against all costs, claims and expenses incurred by ELM in the event [M.T.'s] check to ELM fails to clear [M.T.'s] banking institution." The Agreement also contained a clause stating "[t]his agreement constitutes the entire agreement between the parties and supersedes any and all other agreements or representations made concerning our services and/or products and may be changed only by an agreement in writing signed by the parties."

Paragraph 11 enumerated the fees or charges that M.T. agreed to pay ELM, including the basic fee of "Gross Payroll times 112.50%," as well as items such as workers' compensation fees, returned check fees, and drug screening costs. Paragraph 11(f) stated that M.T. agreed to reimburse ELM for any "Special Projects Charges, i.e., certified payroll reports, to be determined as needed."

ELM provided the leased employees to M.T., and the employees worked for M.T. on both federal and non-federal construction jobs. ELM paid each of the leased employees as required under the Agreement. On March 31, 1995, ELM sent two letters to M.T. regarding two insufficiently funded checks M.T. had issued to ELM in the amounts of $15,025.64 and $14,914.56. On May 15, 1995, ELM sent M.T. another letter because M.T. had issued a third insufficiently funded check for $5,000 to ELM. The letters referred to Utah Code Ann. § 76-6-505 (1995), which defines issuing a bad check and the possible criminal penalties.

At ELM's request, because of M.T.'s substantial arrearages, Told, personally, and on behalf of M.T., signed a Payment Agreement on June 5, 1995. In this agreement, Told and M.T. agreed to pay ELM the principal amount of $116,930.95 owed ELM on or before July 30, 1995. The Payment Agreement also required Told and M.T. to pay interest on the principal sum of thirty-six percent per annum from the date of signing the Payment Agreement. M.T. and Told agreed that, in the event of default on the Payment Agreement, they would pay all costs of collection, including reasonable attorney fees. M.T. and Told additionally agreed to the entry of a judgment by confession in the event of a default.

In June 1995, ELM terminated its contractual relationship with M.T. and filed a complaint against M.T. and Told. In June 1996, ELM filed a Motion for Partial Summary Judgment and Entry of Judgment by Confession. On January 7, 1997, the trial court entered an Order granting ELM's Motion for Partial Summary Judgment. The trial court held that M.T. had breached the original Agreement with ELM and owed ELM $116,-930.55 for leased labor and personnel. The court ordered M.T. to pay that amount, plus a returned check fee of $1,048.20.

The remaining issues were tried to the court. At trial, M.T. claimed that before Told signed the Payment Agreement, employees of ELM several times stated words to the effect that, "[Y]ou got to sign this or we're going to have to go after you for the bad checks, and we're going to stop payroll." Told argued that these statements, combined with certain "threatening" letters, were coercive, and that he signed the Payment Agreement under duress.

The trial court concluded that by signing the Payment Agreement, M.T. and Told entered into a legally binding contract, and that the three letters sent by ELM to M.T. did not constitute duress. The trial court found that the letters were expressly authorized by section 7–15–1 of the Utah Code,[1] and that

---

1. That section provides:
   (2) The holder of the check ... which has been dishonored may give written or verbal notice of dishonor to the person making, drawing, signing, or issuing the check, ... and may impose a service charge that may not exceed $15. Prior to filing an action based upon this section, the holder of a dishonored check ... shall give the person making, drawing, signing, or issuing the dishonored check ... written

ELM had properly given M.T. notice that the checks must be paid within fourteen days to avoid "appropriate legal action." The trial court found further that the statements of ELM and its employees, representatives, or agents did not legally constitute duress. The trial court specifically found that M.T. and Told "failed to prove with clear and convincing evidence that the consent of Defendants ... to the Payment Agreement was obtained under duress." The trial court also found that M.T. and Told had failed to pay the principal amount and accrued interest by July 30, 1995, as required by the Payment Agreement, and were therefore jointly and severally liable for payment in the amount of $116,930.95, as well as for accrued interest and collection costs, including attorney fees. Finally, the court ordered M.T. and Told to pay ELM the sum of the unpaid face amount of the insufficiently funded checks, plus 10% interest as of February 14, 1997. The total judgment in favor of ELM was for $261,-599.12.

## ISSUES

M.T. first argues that it had legitimate offsets of $129,440.00 against the amounts it owed ELM under the Agreement. M.T. argues that because a disputed issue of material fact existed, the trial court erred in entering partial summary judgment for ELM. M.T. also disputes the trial court's ruling that the Payment Agreement was not signed under duress. We address these arguments in order.

### Partial Summary Judgment Appeal

"Summary judgment is appropriate only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *K & T, Inc. v. Koroulis,* 888 P.2d 623, 626–27 (Utah 1994) (citing Utah R. Civ. P. 56(c)).

Because entitlement to summary judgment is a question of law, we accord no deference to the trial court's resolution of the legal issues presented. "We determine only whether the trial court erred in apply-

notice of intent to file civil action, allowing the person seven days from the date on which the notice was mailed to tender payment in full,

ing the governing law and whether the trial court correctly held that there were no disputed issues of material fact."

*Id.* at 627 (quoting *Ferree v. State,* 784 P.2d 149, 151 (Utah 1989) (citations omitted)).

M.T. claims summary judgment was inappropriate because there are disputed issues of fact regarding whether ELM was obligated to provide certified payroll reports, thus allowing an offset for expenses incurred by M.T. in preparing those reports itself after ELM failed to do so. M.T. argues that this obligation is either (1) implied in the contract, or (2) imposed by federal law.

### 1. Contract

■ "[A] trial court's interpretation of the words of an unambiguous, integrated contract is a question of law, which is reviewed on appeal for correctness. Whether ambiguity exists in a contract is itself a question of law." *Crowther v. Carter,* 767 P.2d 129, 131 (Utah Ct.App.1989) (citations omitted). Utilizing ordinary rules of contract construction, if a contract's terms are clear and unambiguous, the court must construe the writing according to its plain and ordinary meaning. *See Homer v. Smith,* 866 P.2d 622, 629 (Utah Ct.App.1993). Further, the contract should be read as a whole, in an attempt to harmonize and give effect to all of the contract provisions. *See Nielsen v. O'Reilly,* 848 P.2d 664, 665 (Utah 1992); *cf. First Am. Title Ins. Co. v. J.B. Ranch, Inc.,* 343 Utah Adv. Rep. 6, 7, 966 P.2d 834, 836 (Utah 1998).

■ The Agreement between ELM and M.T. does not impose a duty on either party to provide payroll reports for work done on federal construction projects. The Agreement specifically spells out each party's duties as to payment, insurance, workers' compensation, and taxes, and while it does provide, in paragraph 11(f), that certified payrolls may be furnished for an additional fee as a "Special Projects Charge," it states that this is "to be determined as needed." Moreover, the Agreement contains a clause

plus the service charge imposed for the dishonored check.... Utah Code Ann. § 7–15–1(2) (1995).

stating that it constitutes "the *entire agreement* between the parties and supersedes any and all other agreements or representations made concerning [ELM's] services and/or products and may be changed only by an agreement in writing signed by the parties." (Emphasis added.) Therefore, under the Agreement, any duty imposed upon ELM to provide payroll reports had to be negotiated and reduced to writing. Also, ELM would be entitled to collect an additional fee for providing these reports.

Significantly, counsel for M.T. admitted at the summary judgment hearing that "[t]he contract itself ... does not mention, within the four corners of the contract ... certified payroll," apparently conceding the contract did not resolve the question in M.T.'s favor. We agree. Therefore, the trial court correctly concluded that there was no contractual duty imposed upon ELM to provide certified payroll reports.

## 2. Federal Law

The issue of whether federal law obligated ELM to provide the payroll reports was raised rather obliquely. First, in a supplemental affidavit, Told stated that "[u]nder the Contract Employee Agreement ELM obligated itself to provide certified payrolls as required in Federally Funded Projects to comply with the Davis Bacon & Farr Statutes/Regulations as rendered by the Department of Labor."

Subsequently, at the hearing on ELM's Motion for Partial Summary Judgment, the trial court asked M.T.'s counsel which specific federal law required the certified payroll reports, and who had the obligation under the federal law to provide the reports. Counsel responded by saying he did not have a copy of the federal statute with him and could not provide the court with a citation, but that "to satisfy the statute, one, or the other parties needs to provide [the certified payroll reports]." ELM countered that, in order to be paid, the general contractor in a federally funded project must provide certified payroll records for all employees working on such projects. ELM also stated that this requirement was generally addressed in contracts between the general contractor and

its subcontractors. Based on this sparse information and argument, the trial court understandably found there was no federally imposed duty on ELM to provide certified payroll records.

To determine whether federal law imposes a duty on ELM to provide certified payroll records, we have examined federal statutes and regulations not previously provided by M.T. to either the trial court or this court.

The Davis–Bacon Act, 40 U.S.C. §§ 276a to 276a–7 (1988), and the Copeland Anti–Kickback Act, 40 U.S.C. § 276c (1988), regulate federally funded construction projects for the purpose, among others, of protecting "the employees of Government contractors." *Kelso v. Kirk Bros. Mechanical Contractors, Inc.,* 16 F.3d 1173, 1176 (Fed.Cir.1994).

Chapter 40 of the U.S.Code § 276c (1988) provides:

> The Secretary of Labor shall make reasonable regulations for contractors and subcontractors engaged in the construction, prosecution, completion or repair of public buildings, public works or buildings or works financed in whole or in part by loans or grants from the United States, including a provision that *each contractor and subcontractor shall furnish weekly a statement with respect to the wages paid each employee during the preceding week.*

(Emphasis added.) The Code of Federal Regulations states:

> (e) Every person paid by a contractor or subcontractor in any manner for his labor in the construction, prosecution, completion, or repair of a public building or public work or building or work financed in whole or in part by loans or grants from the United States is *employed and receiving wages, regardless of any contractual relationship alleged to exist between him and the real employer.*

29 C.F.R. § 3.2(e) (1997) (emphasis added). Pursuant to these provisions, the wages of all employees leased from ELM by M.T. would need to be included in weekly reports for work performed on federally funded projects. The remaining question is who is required to provide the reports in a situation such as the

one before us, when a subcontractor performs work using leased employees.

Federal regulations further state that:

(b) Each contractor or subcontractor ... shall furnish each week a statement with respect to the wages paid each of its employees engaged on work covered by this ... chapter during the preceding weekly payroll period. *This statement shall be executed by the contractor or subcontractor or by an authorized officer or employee of the contractor or subcontractor who supervises the payment of wages*
. . . .

29 C.F.R. § 3.3(b) (1997) (emphasis added). We construe this regulation to mean that any subcontractor on a federal project, which includes M.T., must provide weekly certified wage statements that are to be executed by the subcontractor *or* another properly authorized to do so. In other words, the subcontractor—in this case M.T.—must provide the reports, but they may be executed either by M.T. or M.T. may authorize ELM to do so.

Additionally, 29 C.F.R. § 3.11 (1997) states: "All contracts ... financed ... by the United States .... shall expressly bind the contractor or subcontractor to comply with such of the regulations in this part as may be applicable." Consequently, assuming compliance with this regulation, the contracts between M.T. and the general contractors on federal projects included provisions requiring M.T. to comply with applicable federal law, including providing weekly payroll reports. *See Kelso,* 16 F.3d at 1176 (stating when federal requirements are incorporated into contract, they are binding on contractor and failure to comply may result in default contract termination). We note that Told testified that occasionally the general contractor had used the fact that M.T. had not submitted its certified payrolls as an excuse to not pay M.T. for its work on certain federal projects. Thus, we assume there was a contractual provision between M.T. and the general contractor regarding the submission of payroll reports, as required by 29 C.F.R. § 3.11.

In order for M.T. to receive payment from the general contractor, it was obligated to provide certified payroll records for work done on federal projects by employees of ELM leased to M.T. However, federal law appears to allow the contractor *or* subcontractor *or* employee of either who supervises wage payment to provide certified payroll records. *See* 29 C.F.R. § 3.3(b). Therefore, in this case, the duty to provide payroll reports could be negotiated by the parties, as the Agreement at issue in this case apparently anticipated.[2]

We believe that the issue here is essentially one of law, not fact. "Matters of statutory construction are questions of law that are reviewed for correctness." *Platts v. Parents Helping Parents,* 947 P.2d 658, 661 (Utah 1997); *see also Kelso,* 16 F.3d at 1175 (stating interpretation of federal labor regulations is question of law). Having had the opportunity to examine the federal statute and regulations, we determine that federal law does not impose the duty upon ELM to provide the payroll records, and neither does the Agreement between the parties. Accordingly, the trial court did not err in refusing to allow M.T. to claim offsets against the amounts it owed ELM under the Agreement, and thus we find no error in the trial court's award of partial summary judgment to ELM.

### Duress

M.T. next appeals the trial court's determination that the Payment Agreement was not signed under duress. In order to successfully attack factual findings, "[a]n appellant must marshal the evidence in support of the findings and then demonstrate that despite this evidence, the trial court's findings are so lacking in support as to be 'against the clear weight of the evidence,' thus making them 'clearly erroneous.'" *In re Estate of Bartell,* 776 P.2d 885, 886 (Utah 1989) (quoting *State v. Walker,* 743 P.2d 191, 193 (Utah 1987)). In determining whether the trial court's findings of fact are clearly erroneous, "'due regard shall be given to the opportunity of the trial court to judge the credibility of the

2. As stated earlier, under the Contract Employee Agreement at paragraph 11(f), ELM was entitled to collect a fee if it prepared certified payroll reports, but such fee was "to be determined as needed." This provision was not addressed before the trial court.

witnesses.'" *Bailey v. Call,* 767 P.2d 138, 139 (Utah Ct.App.1989) (quoting Utah R. Civ. P. 52(a)); *see also Matthews v. Galetka,* 958 P.2d 949, 951 (Utah Ct.App.1998) ("It is the prerogative of the trial court to judge the credibility of the evidence.... [The court] is not compelled to believe evidence where there is anything about it which would reasonably justify refusal to accept it as the facts, and this includes the self-interest of the witness.") (citing *Strong v. Turner,* 22 Utah 2d 294, 452 P.2d 323, 324 (Utah 1969)). "If the appellant fails to marshal the evidence, the appellate court assumes that the record supports the findings of the trial court." *Saunders v. Sharp,* 806 P.2d 198, 199 (Utah 1991).

M.T. has failed to marshal the evidence supporting the trial court's findings regarding duress, much less demonstrate that those findings are contrary to the evidence. Particularly striking is the trial court's finding that M.T. presented taped evidence of conversations between Told and ELM employees—tapes which allegedly demonstrated the duress ELM exerted upon Told to sign the Payment Agreement—yet all of the tapes contained conversations that did not take place until *after* M.T. had signed the contract. M.T. has failed to demonstrate that the trial court's findings, made after considering all the testimony and evidence, are clearly erroneous. Accordingly, its argument on this point fails.

### CONCLUSION

Neither federal law nor the Contract Employee Agreement imposed upon ELM the duty to provide certified payroll reports. Thus, the trial court correctly found that M.T. was not entitled to offset any amounts owed to ELM, and the court did not err in granting partial summary judgment to ELM for amounts owing under the Agreement. We further hold that M.T. has failed to carry its burden to marshal the evidence on appeal, and we thus affirm the trial court's ruling on the issue of duress.

BILLINGS, and JACKSON, JJ., concur.