**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 23, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SUSAN MANCHESTER; SUN 'N
FUN WATER PARK, LLC,

       Plaintiffs-Appellants,

v.

CERTAIN UNDERWRITERS AT
LLOYDS, LONDON;
INTERNATIONAL SPECIAL
EVENTS AND RECREATION
ASSOCIATION, INC.,

       Defendants-Appellees.

No. 08-6119

(D.C. No. CV-07-179-C)
(W. D. Oklahoma)

**ORDER AND JUDGMENT**[*]

Before **KELLY, BRISCOE,** and **McCONNELL**, Circuit Judges.

Plaintiffs Susan Manchester, the trustee for the personal bankruptcy estate

of Ron and Danielle Behar, and Sun 'N Fun Water Park, LLC, appeal from the

district court's grant of summary judgment in favor of defendants International

Special Events and Recreation Association, Inc., and Certain Underwriters at

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Lloyds London, on plaintiffs' claims for breach of contract and breach of duty of good faith and fair dealing. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I

*The water park and its sale*

Bill and Betty Rutz, through a corporation entitled Sun 'N Fun Family Recreation, Inc. (hereinafter Inc.), were the longtime owners and operators of a water park located in Ponca City, Oklahoma. In 2004, "the Rutzes decided that they wanted to retire from the water park business and [thus] began the process of finding a buyer." App. at 141. In mid-June of 2005, the Rutzes agreed to sell the water park to Ron and Danielle Behar. At that time, the "Rutzes and Behars created and signed various documents relating to the purchase and financing of the water park." Id. Shortly after signing these documents, the Behars formed an Oklahoma limited liability company called Sun 'N Fun Waterpark, LLC (hereinafter LLC), to own and operate the water park.

On June 29, 2005, the Rutzes and Behars met with Larry Buck, a loan officer at Eastman National Bank, to close the sale of the water park.[1] At that meeting, the "Behars signed all documents required by Eastman National Bank . . . to loan funds to [the] Behars to purchase the [w]aterpark," and the Rutzes

_____

[1] Eastman National Bank had previously provided funding to the Rutzes and Inc., and had agreed to provide funding for the sale to the Behars and LLC.

"delivered a fully executed Warranty Deed to the waterpark to [the] Behars." Id.

"Eastman National Bank disbursed funds from the Behar loan to pay in full the

[Rutzes'] loans related to the water park." Id.

The "Behars took over operation of the water park after June 29, 2005, and

they changed the locks to the [w]ater park and did not provide keys to the new

locks to [the] Rutzes." Id. at 145. LLC "registered with the State of Oklahoma as

the new owner of the [w]ater park effective July 1, 2005." Id. at 146. "As part of

assuming operations of the [w]aterpark," LLC and the Behars "utilized the

existing bank account, paid past and current bills from the bank account and

deposited all revenues into the bank account." Id. at 152. In turn, Eastman

National Bank "honored checks and funded transfers by both the Rutzes and the

Behars." Id.

*The accidental death*

On July 14, 2005, the Behars authorized an after-hours employee "slide

night." Aplee. App. at 8. During this event, "Alan J. Bray, an employee of the

waterpark, fell from one of the water slides while he was 'chain-riding' down the

slide," "and died as a result of his injuries." Id.

*Insurance coverage for the water park*

Prior to June 2005, Inc. was covered by a commercial liability insurance

policy issued through the International Special Events and Recreation

3

Association, Inc. (ISERA)[2], by Certain Underwriters at Lloyds, London (Underwriters).  On June 13, 2005, Underwriters, acting through ISERA, sent the Rutzes a notice that Inc.'s current liability insurance policy would expire on June 25, 2005.  Along with the notice, Underwriters sent the Rutzes a quotation for a renewal policy.

On June 25, 2005, four days before the Behars took control of the water park, Inc. took steps to renew its policy with Underwriters.  As part of that renewal, Mrs. Rutz sent a premium check to Underwriters for the Inc. renewal policy.  On July 7, 2005, Underwriters issued and mailed to Inc. a renewal policy (the Policy).  On July 29, 2005, the Rutzes, acting on behalf of Inc., signed and faxed to Underwriters a "Coverage Contract Receipt Form" for the Policy.  App. at 111, 273.

The Policy listed Inc. as the "Participating Member," and listed the effective date as June 25, 2005.  Id. at 111, 274.  Further, the Policy included a section entitled "Non-Assignable" that provided that "[t]he interest of the Participating Member under this Coverage Contract cannot be assigned without the prior written consent of the Insurer."  Aplee. App. at 11.

During the negotiations between the Behars and Rutzes for the sale of the

---

[2] According to the record, ISERA, a corporation domiciled in Utah with its principal place of business in Sandy, Utah, is a "risk purchasing group" and was listed as the "Master Coverage Contract Holder and Name[d] Insured" under the Inc.'s policy of insurance.  Aplee. App. at 10.

water park, there was discussion of having Inc.'s commercial liability policy transferred to the Behars or LLC. There is no evidence, however, that any such transfer ever took place. In particular, there is no evidence that either the Rutzes or the Behars sought permission from Underwriters to transfer the Policy to the Behars or LLC.

On July 25, 2005, a payment on the Policy came due. Ron Behar was purportedly "unsure whether the water park should make the payment and made a note to forego payment until consulting counsel." Id. at 112. Less than a week later, on August 1, 2005, Behar sent a premium payment to Underwriters in the amount of $3,958.86, using the checking account that had previously been used by the Rutzes. That premium payment was subsequently returned to Behar by Underwriters and ISERA in October of 2005.

On July 27, 2005, nearly a month after completion of the purchase of the water park and approximately two weeks after Bray's accidental death, the Behars applied for new insurance coverage for LLC. On August 1, 2005, ISERA provided to the Behars a package of materials describing the coverage options available from Underwriters. On August 3, 2005, the Behars purchased, and Underwriters issued to LLC, through ISERA, a commercial liability insurance policy. By its express terms, the LLC policy was effective from August 3, 2005, through August 3, 2006.

*The Bray lawsuit*

On July 15, 2005, Ron Behar sent a letter to the Rutzes advising them of Bray's death and stating: "Due to the severe nature of this incident, I am giving you written notice to contact your insurance carriers immediately and provide them any and all information that may be available in order to expedite their investigation of this incident." Aplee. App. at 109. Along with the letter, Behar sent a completed incident form for the Rutzes to forward to Underwriters. Underwriters received a copy of the completed incident form on or about July 21, 2005, and formally recorded the loss notice in its records.

On April 18, 2006, the parents of Alan Bray filed a wrongful death lawsuit in the United States District Court for the Western District of Oklahoma against the Behars, LLC, the Rutzes, Inc., and four of the water park's employees. The Rutzes and Inc. sought, but were denied, coverage from Underwriters under the Policy. Neither the Behars nor LLC ever contacted Underwriters or ISERA regarding the filing of the Bray lawsuit, nor did the Behars or LLC ever make a demand upon Underwriters to defend them in the Bray lawsuit. Instead, the Behars sought and were provided representation by their homeowners' insurance company under a reservation of rights. LLC unsuccessfully sought coverage for the Bray lawsuit from its workers' compensation liability carrier.

*The Oklahoma state action between the Rutzes and Behars*

In the aftermath of Bray's death, a dispute arose between the Rutzes and

6

the Behars regarding, in pertinent part, whether the sale of the water park had actually been completed and, if so, when it had occurred.[3]  In late 2005, the Rutzes and Inc. filed suit in Oklahoma state court against the Behars and LLC for breach of contract.  The matter proceeded to a bench trial in June 2006.  On July 18, 2006, the state district court issued detailed findings of fact and conclusions of law.  The state district court determined, in pertinent part, "that the purchase of the water park 'closed' and became final on June 29, 2005, with legal title to the water park and associated real property vesting in [LLC] as of that date."  Aplee. App. at 61.  The state district court further concluded that the Behars were in default under a promissory note issued by Eastman National Bank, that Eastman National Bank held a valid first mortgage against the water park, that the Behars were indebted to the Rutzes and/or Inc. in the amount of $330,000 plus interest, and that Eastman National Bank, the Rutzes, and Inc. were "entitled to foreclosure against the" water park.  Id. at 62.

The Behars and LLC unsuccessfully appealed the state district court's decision to the Oklahoma Supreme Court.

*The instant action*

On February 13, 2007, the Behars and the LLC filed this diversity action

---

[3] In September 2005, the Behars notified the Rutzes "that they would not conclude the purchase of the waterpark" or, alternatively, if the purchase had already closed, they wanted "the transaction" to be "rescinded."  App. at 155.  In connection with this notice, the Behars "vacated their operation of the [w]aterpark and returned all assets, keys and possession of the [w]aterpark to" the Rutzes.  Id.

7

against Underwriters and ISERA asserting claims for breach of contract and breach of duty of good faith and fair dealing. Underwriters and ISERA ultimately moved for summary judgment with respect to both of the claims asserted against them. The plaintiffs[4] filed a motion for partial summary judgment asserting that they were insured under the Policy. On April 30, 2008, the district court issued a memorandum opinion and order denying the plaintiffs' motion for partial summary judgment and granting defendants' motion for summary judgment. In doing so, the district court concluded that "[plaintiffs were not covered under [the Policy] so as to be entitled to defense or indemnification for claims arising because of the death of . . . Bray." App. at 30.

## II

Plaintiffs challenge the district court's summary judgment ruling on appeal, asserting three general arguments. First, plaintiffs argue that the district court erred in failing to recognize that the Policy was effectively assigned to them upon its issuance in late July 2005, after Bray's death. Second, plaintiffs assert the district court erred in concluding that Underwriters did not waive its reliance on

---

[4] After filing this action, the Behars and LLC Water Park each filed for bankruptcy. On May 8, 2007, Susan Manchester, the trustee for the personal bankruptcy estate of the Behars, was substituted for the Behars as the real party in interest. On that same date, Lyle Nelson, the bankruptcy trustee for the LLC Water Park's bankruptcy estate, was substituted for the LLC Water Park as the real party in interest. In September of 2007, however, LLC Water Park converted its bankruptcy proceedings from Chapter 7 to Chapter 11. Thus, LLC Water Park was substituted as the real party in interest for Lyle Nelson, effective September 11, 2007.

8

the non-assignment provision of the Policy as a basis for denying coverage to LLC for Bray's death. Third, plaintiffs argue that the district court erred in concluding that the Behars were not "participating members" under, and thus covered by, the terms of the Policy. We address these arguments in turn.

*Standard of review*

"We review a district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to the non-moving party." Potts v. Davis County, 551 F.3d 1188, 1192 (10th Cir. 2009) (italics in original). "Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c)).

"This court applies the substantive law of the forum state when, as here, we exercise diversity jurisdiction." Clark v. State Farm Mut. Auto. Ins. Co., 433 F.3d 703, 709 (10th Cir. 2005). The parties agree that, due to the presence of a choice of law provision in the Policy, Utah law governs our interpretation of the Policy. See Flying J Inc. v. Comdata Network, Inc., 405 F.3d 821, 831 n.4 (10th Cir. 2005) ("Because the parties do not raise a choice-of-law issue, we construe and interpret the Trendar License under Utah law."); Harvell v. Goodyear Tire & Rubber Co., 164 P.3d 1028, 1033-34 (Okla. 2006) (holding that Oklahoma's choice of law rules give effect to contractual choice of law provision). In

9

applying Utah law, we look to the "most recent statement of state law by the [Utah] Supreme Court." Clark, 433 F.3d at 709. We may also, in the absence of a controlling decision from the Utah Supreme Court, look to the decisions of Utah's intermediate appellate courts as "some evidence of how the state supreme court would decide the issue . . . ." Id. (internal quotation marks omitted).

*Effective assignment of policy*

In their first issue on appeal, plaintiffs contend that they are entitled to coverage under the Policy for any liability arising out of Bray's death because the Policy was effectively assigned to them upon its issuance by Underwriters. In support of this contention, plaintiffs first assert that, under Utah law, "insurance policies prohibiting assignments without prior consent of the insurer apply only to assignments prior to the loss." Aplt. Br. at 16 (citing Time Finance Corp. v. Johnson Trucking Co., 458 P.2d 873, 875 (Utah 1969)). In turn, plaintiffs argue that the Policy "did not become valid and effective until [its issuance on] July 29, 2005," after Bray's accidental death on July 14, 2005. Id. Consequently, plaintiffs argue, "the proceeds under th[e] [P]olicy, which covered the Bray claim, w[ere] no longer executory, and had evolved into a mature money claim – of defense and indemnity or the refund of the unearned premium – on July 29, 2005." Id.

We agree with defendants, however, that the flaw in plaintiffs' arguments is their assumption that Bray's death on July 14, 2005, immediately gave rise to a

"loss" under the Policy (or, as they have put it, immediately "evolved into a mature money claim"). Section I of the Policy, entitled "COVERAGE," stated that Underwriters would "pay Damages in excess of any [self-insured retention] that [the insured was] legally obligated to pay" in the event that the following three conditions were met:

> a. Should an Accident causing Bodily Injury or Property Damage result from those specified activities or operations to which this Coverage Contract is limited; and
>
> b. If such Accident occurs during the Coverage Contract Period (including any Coverage Contract Period extended by a specifically identified Retroactive Date) stated on the Participant Member Declaration Certificate and within the United States of America or its territories; and
>
> c. If any Claim arising out of the Accident is made against you and reported to us in writing during the Coverage Contract Period and any applicable [self-insured retention] has been timely paid.

App. at 278-79 (emphasis added). Section VI of the Policy, entitled "DEFINITIONS," in turn defined the term "Claim(s)" as "any demand for Damages, including a written demand, a civil action, Suit, or institution of arbitration proceeding." Id. at 294. In light of this language, it is clear that the Policy was a "claims-made" rather than an "occurrence" policy. See generally AOK Lands, Inc. v. Shand, Morahan & Co., 860 P.2d 924, 927 (Utah 1993) (discussing differences between "claims made" and "occurrence" policies). Further, it is uncontroverted that no "claim" was made in connection with Bray's

11

death until April 18, 2006, when Bray's parents filed suit in federal court against the Behars, LLC, the Rutzes, and Inc. Thus, contrary to plaintiffs' assertions, the uncontroverted facts establish that Bray's death had not, as of the time the Policy was issued, "evolved into a mature money claim" (or, in the terms of the Policy, given rise to any legal obligation on the part of Underwriters to pay or defend).

*Waiver/estoppel - non-assignment provision of the Policy*

In their second issue on appeal, plaintiffs assert that there was sufficient evidence from which a reasonable jury could have found that Underwriters either "waived its right to assert the non-assignment clause" in the Policy, Aplt. Br. at 18, or was otherwise "estopped from asserting the non-assignment provision," id. at 25.

*a) Waiver*

In support of their waiver argument, plaintiffs assert that Underwriters "had notice of the park's ownership transfer and the Bray accident on July 22, 2005, before the Rutz[es] accepted the" Policy. Aplt. Br. at 19. Notwithstanding this knowledge, plaintiffs assert, Underwriters "elected to allow the [P]olicy to be executed and remain in place" by "retain[ing] the premium down payment . . . and accept[ing] an installment payment from Mr. Behar of $3,958.86" in early August of 2005. Id.

Under Utah law, "the question of waiver frequently turns upon whether a party had the requisite intent to waive the right in question." Cont'l Ins. Co. v.

Kingston, 114 P.3d 1158, 1161 (Utah App. 2005). "The intent to relinquish a right need not be express and 'may be implied from action or inaction.'" Id. (quoting K & T, Inc. v. Koroulis, 888 P.2d 623, 628 (Utah 1994)).

Applying these principles to the evidence cited by plaintiffs, we agree with the district court that plaintiffs failed to present sufficient evidence to create a genuine issue of material fact regarding the issue of waiver. Although the evidence would have allowed a jury to reasonably find that defendants had knowledge that the Rutzes intended to sell the water park to the Behars, there is no evidence in the record indicating that defendants were aware, prior to approximately August 15, 2005, of the effective date of the sale.[5] Further, and even more importantly, defendants were never provided with any oral or written notice that the Rutzes or Inc. wished to have the Policy transferred to LLC. Although it is undisputed that Ron Behar sent defendants a premium payment on the Policy in early August of 2005, it is also undisputed that the payment was made out of a checking account that had previously been utilized by the Rutzes and Inc., and there is no evidence indicating that defendants knew or should have known, as of the time they received the payment, that it was being made on behalf

---

[5] According to the record, Underwriters became aware, on or about August 15, 2005, "that the waterpark changed ownership on July 1st . . . ." App. at 327. In its internal notes of that same date, Underwriters specifically noted that "the coverage contract [wa]s non-transferrable." Id.

13

of LLC.[6]  Finally, it is undisputed that shortly after sending the premium payment to Underwriters, Ron Behar submitted to Underwriters an application on behalf of LLC for a new commercial liability policy.  The only inference that could reasonably be drawn by Underwriters from this application was that the Behars and LLC did not wish to have the Policy transferred to them.  In sum, the evidence was insufficient to have allowed a jury to reasonably find that Underwriters effectively agreed to the Policy being transferred from Inc. to LLC and thereby waived any reliance on the Policy's non-assignment clause.

*b) Estoppel*

Plaintiffs also argue that the district court erred in concluding that the evidence was insufficient to allow a jury to reasonably find that Underwriters was "estopped from asserting the non-assignment provision."  Aplt. Br. at 25.  According to plaintiffs, the evidence established that Underwriters "retained the premiums paid on the . . . [P]olicy," despite its knowledge of the sale of the water park.  Id.  Such evidence, plaintiffs assert, "suffices under estoppel principles."  Id.

Utah "caselaw requires proof of three elements for *equitable estoppel*: first, 'a statement, admission, act, or failure to act by one party inconsistent with a

---

[6] The evidence in the record indicates that, at one point, Underwriters' personnel believed that the sale of the water park was being accomplished by the Behars purchasing Inc., which obviously would not have required the transfer of the Policy to a different entity.

14

claim later asserted'; next, 'reasonable action or inaction by the other party taken or not taken on the basis of the first party's statement, admission, act or failure to act'; and, third, 'injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act.'" Youngblood v. Auto-Owners Ins. Co., 158 P.3d 1088, 1092 (Utah App. 2007) (italics in original; quoting Nunley v. Westates Casing Servs., Inc., 989 P.2d 1077, 1088 (Utah 1999)).

For essentially the same reasons discussed above in connection with the plaintiffs' waiver argument, we conclude that the evidence presented by plaintiffs to the district court was insufficient to have allowed a jury to reasonably find in favor of plaintiffs on their estoppel theory. Most notably, there is no evidence of a "statement, admission, act, or failure to act by" Underwriters that could reasonably be considered inconsistent with its reliance on the non-assignment provision of the Policy.[7] Nor, for that matter, is there any evidence of reliance on the part of the Behars or LLC. Thus, plaintiffs' estoppel theory is without merit.

*Were the Behars "participating members" under the Policy?*

In their third and final issue on appeal, plaintiffs argue that the district court erred in concluding that the Behars were not "participating members" under,

---

[7] Plaintiffs suggest, without further explanation, that Underwriters "demonstrated its willingness to accept an assignment in that [it] issued a new, concurrent policy to the LLC in August 2005." Aplt. Br. at 27. We reject this argument as untenable.

15

and thus were not covered by, the terms of the Policy.  According to plaintiffs, a jury could reasonably have found that the Behars were covered under the Policy as "participating members" because they served "either [as] employee[s] or . . . real estate manager[s]" at the water park.  Aplt. Br. at 27.

By its express terms, the Policy provided liability coverage for the "Participating Member."  App. at 278 (coverage provisions of Policy).  The Policy's "Participating Member Declaration Certificate" listed Inc. as the "Participating Member."  Id. at 274.  The Policy also stated in Section II, entitled "WHO IS A PARTICIPATING MEMBER?," that "[e]ach of the following" would "also [be considered] a Participating Member": "Your employees, . . . but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business," id. at 286, and "[a]ny person (other than your employee) or any organization while acting as your real estate manager," id. at 287.

In their attempt to establish that they fall within the scope of this Policy language, plaintiffs begin by noting the Policy does not define the terms "employee" or "real estate manager."  Aplt. Br. at 29.  Plaintiffs in turn argue, citing an old Fifth Circuit case, Travelers Ins. Co. v. Brown, 338 F.2d 229, 237 (5th Cir. 1964), that the term "employee," as used in a contract of insurance, should be interpreted as "describing the employer's liability to the public."  Aplt. Br. at 29.  Under this interpretive rule, plaintiffs argue, "facts[] that sometimes

16

might otherwise be irrelevant or insignificant[] need to be considered in determining whom the contracting parties intended to be 'employees' for purposes of the contract." Id. In this case, plaintiffs argue, "the [P]olicy's purpose was to provide liability insurance for the Rutzs' [sic] Corp. in conducting the business operations of the park." Id. Further, plaintiffs argue, "[a]t the time of contracting, [Underwriters] knew that the Rutzs [sic] had transferred the insured property and the park's operations to Behars' LLC," and that, "pursuant to the sale, the employees of the Rutzs' [sic] Corp. transferred to the Behars' LLC on July 1, 2005." Id. Thus, plaintiffs argue, "[t]he only logical conclusion is[] that if the policy was not going to be rescinded, the employees of the Behars' LLC are the employees covered under the policy." Id.

"Similarly," plaintiffs argue, "only the Behars' LLC could have been the real estate manager under the [P]olicy." Id. at 30. In this regard, plaintiffs argue that, "[w]ithout dispute, on July 14, 2005 the Behars and the Behars' LLC were the exclusive managers of the certain real estate insured under the June 2005 . . . [P]olicy." Id. More specifically, plaintiffs assert that "[t]he Rutzs [sic] did not have access to the park, except by the Behars['] permission," and "[t]he Behars' LLC exclusively controlled and managed the water park business, including the activities and operations listed on the policy declarations sheet and were therefore the real estate managers and employees under the policy." Id.

Plaintiffs' arguments are clearly lacking from both a legal and a factual

17

perspective. To begin with, plaintiffs' arguments all but ignore Utah law, which accords undefined words in an insurance contract their "usual and natural meaning." Mellor v. Wasatch Crest Mut. Ins. Co., — P.3d —, 2009 WL 172773 at *3 (Utah 2009) (internal quotation marks omitted). Applying that controlling principle to the Policy, the term "employee," as used in the Policy, would be defined as "[a] person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." Black's Law Dictionary (8th ed. 2004). Further, the term "real estate manager," as used in the Policy, would be defined as "[a] person who administers or supervises the [real estate] affairs of a business, office, or other organization." Id. (defining term "manager").

From a factual perspective, there is simply no evidence that would allow a jury to reasonably find that the Behars or LLC served as "employees" or the "real estate manager" for Inc. Water Park. As previously noted, it has been conclusively determined in the Oklahoma state court litigation "that the [Behars'] purchase of the water park 'closed' and became final on June 29, 2005, with legal title to the water park and associated real property vesting in [LLC] as of that date." Aplee. App. at 61. Thus, on the date of Bray's accidental death, July 14, 2005, the water park was under the sole ownership and control of the Behars, through their LLC. Thus, there is no basis for concluding that, as of that date, either the Behars or LLC were performing duties on behalf of the Rutzes or Inc.

18

Therefore, the district court did not err in concluding, as a matter of law, that neither the Behars nor LLC qualified as "participating members" under the Policy.

The judgment of the district court is AFFIRMED.

**McConnell**, Circuit Judge, concurs in the judgment.

Entered for the Court


Mary Beck Briscoe
Circuit Judge