AURORA CREDIT SERVICES, INC., a Minnesota corporation, Plaintiff and Appellant,

v.

LIBERTY WEST DEVELOPMENT, INC., a Utah corporation, XM International, a Utah limited liability company, and Dennis W. Gay, an individual, Defendants and Appellees.

No. 970154.

Supreme Court of Utah.

Nov. 24, 1998.

Eric P. Hartman, Salt Lake City, for plaintiff

John E. Swallow, Steven B. Smith, Kami L. Peterson, Salt Lake City, for defendants

ZIMMERMAN, Justice:

Aurora Credit Services, Inc., appeals the trial court's grant of partial summary judgment on its derivative claims and dismissal of its direct claims against Liberty West Development, Inc., XM International, and Dennis Gay. Aurora also appeals the trial court's denial of its motion to amend its complaint. We reverse.

In 1986, Dennis W. Gay, James Hogle, Jr., and two other individuals formed Liberty West Development, Inc. ("LWD"). LWD borrowed money to develop an office complex on property located in Ogden, Utah ("the property" or "the Ogden property"), and used the property to secure the loan. Ultimately, the Internal Revenue Service leased the office complex. Both Gay and Hogle occupied positions as corporate officers of LWD: Gay was CEO from 1990 until its dissolution, and Hogle was president from 1986 to 1991.

By 1990, LWD was in financial trouble. LWD owed on the loan used to purchase the property and on other obligations, and there were numerous liens against the property. Around this time, Union National Bank of Chicago sued Hogle for an unrelated debt and obtained a money judgment against him. Union National Bank subsequently failed, and the Federal Deposit Insurance Corporation ("FDIC") took over its assets, including the judgment against Hogle. On February 20, 1991, Hogle executed a security agreement in favor of the FDIC in which he pledged his 2,500 shares of LWD stock as collateral for the judgment. In connection with this pledge, Hogle gave the FDIC a financial statement which valued the pledged LWD stock at $200,000. When Hogle pledged his stock, he was still president of LWD.

In November of 1991, Aurora Credit Services, Inc. ("Aurora"), purchased a package of assets from the FDIC at a judgment auction. This package included the judgment against Hogle. In December of 1991, Aurora contacted Hogle and offered to accept $87,500 to satisfy the entire judgment against him, which was approximately $125,000 at that point. Hogle, however, made neither an indication of acceptance nor any

payments to Aurora. On January 8, 1992, the FDIC executed a formal assignment to Aurora of its interest in the Hogle judgment, including its security interest in Hogle's LWD stock. Aurora notified LWD and Gay of its acquisition of the security interest on January 20, 1992. Aurora foreclosed on the security in the Hogle stock in April of 1993.

From the time the FDIC acquired the interest in the Hogle judgment and through early July of 1993, after it had been assigned to Aurora, LWD represented first to the FDIC and then to Aurora that it owned and was trying to sell the Ogden property. LWD represented that it expected to recover $800,000 to $1,000,000 of equity in the property. However, after May of 1991, these and other statements made to Aurora were no longer true. This is because in early 1991, Restaurant Store & Equipment Supply Company, Inc. ("Restaurant Co."), sued and obtained a judgment against LWD for nonpayment on a contract. Restaurant Co. then obtained a writ of execution, and on April 24, 1991, the Weber County Sheriff recorded a levy on the property with the Weber County Recorder's Office. On May 15, 1991, a sheriff's sale was held and the property sold to Restaurant Co. The sheriff issued Restaurant Co. a certificate of sale giving notice of LWD's statutory right of redemption. The sheriff recorded the certificate of sale on May 16, 1991. Less than a week after Restaurant Co. purchased the property at the sheriff's sale, Restaurant Co. sold the property to XM International ("XM"), a general partnership owned jointly by Gay and a George Bybee. LWD never exercised its right of redemption and therefore lost all interest in the property on November 15, 1991, at the expiration of the six-month redemption period.

On July 7, 1993, Gay informed Aurora that LWD no longer owned the property. After learning that XM owned the Ogden property, Aurora demanded that Gay and XM return it to LWD. XM did not return the property to LWD, and Aurora filed a complaint in the district court on August 5, 1994. Aurora filed an amended complaint on October 17, 1994, asserting both derivative and direct claims alleging that Gay negligently and intentionally mismanaged LWD, breached his fiduciary duties, and wasted corporate assets. Aurora sought issuance of stock certificates in its name, requested to review corporate books, and alleged personal and corporate losses. LWD moved to dismiss Aurora's direct claims, which the court did on December 12, 1994.[1] Aurora thereafter asked for leave to amend the judgment dismissing its direct claims or to allow Aurora to amend its amended complaint. The trial court denied both requests on March 20, 1995.

LWD then moved the court for summary judgment dismissing Aurora's derivative claims, arguing that Aurora did not have standing to sue LWD because Aurora was not a shareholder of LWD when the alleged injury occurred. Essentially, LWD argued that under the contemporaneous ownership rule, Aurora lacked standing to bring a derivative claim. On December 20, 1995, the trial court granted LWD's motion for partial summary judgment.[2] Aurora again moved the court to amend its judgment or to permit it to amend its amended complaint. The court denied both motions, and Aurora now appeals.

Before this court, Aurora argues that the trial court erred in granting partial summary judgment on its derivative claims, in dismissing its direct claims, and in denying its mo-

---

**1.** LWD challenged only counts III through VII, alleging both direct and derivative claims, in its motion to dismiss and its motion for partial summary judgment. The two counts the trial court did not dismiss are count I, seeking an order compelling LWD and Gay to issue new stock certificates in Aurora's name, and count II, seeking access to LWD's books and records. Unless otherwise indicated, all references to Aurora's claims in the pleadings are to counts III through VII.

**2.** As indicated, LWD challenged only counts III through VII of Aurora's complaint. In granting LWD's motion to dismiss, the trial court dismissed the direct claims alleged in counts III through VII. In its motion for partial summary judgment, LWD asked the court to grant it summary judgment on the derivative claims alleged in counts III through VII.

tion to amend. We first review the trial court's grant of partial summary judgment.

■ "Summary judgment is appropriate only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *K & T, Inc. v. Koroulis,* 888 P.2d 623, 626–27 (Utah 1994) (citing Utah R. Civ. P. 56(c)). Because a summary judgment challenge presents only legal issues, we review the grant of summary judgment for correctness. *See Drysdale v. Ford Motor Co.,* 947 P.2d 678, 680 (Utah 1997). We consider only whether the trial court correctly applied the law and correctly concluded that no disputed issues of material fact existed. *See Koroulis,* 888 P.2d at 627. "[I]n reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Higgins v. Salt Lake County,* 855 P.2d 231, 233 (Utah 1993).

The trial court granted summary judgment in LWD's favor on Aurora's derivative claims because it found that rule 23.1 of the Utah Rules of Civil Procedure barred Aurora from bringing a derivative action since Aurora was not a shareholder at the time of the alleged injury. Rule 23.1 requires:

> In a derivative action brought by one or more shareholders . . ., the complaint shall be verified and shall allege . . . [i] that the plaintiff was a shareholder or member at the time of the transaction of which he complains or [ii] that his share or membership thereafter devolved on him by operation of law. . . .

Utah R. Civ. P. 23.1. Under rule 23.1, Aurora has two alternatives for demonstrating that it has standing to bring a derivative action against LWD. First, Aurora must show that it was a shareholder at the time the Ogden property was sold—this requirement is commonly known as the contemporaneous ownership doctrine. Second, and alternatively, if Aurora was not a shareholder at the time of the sale, Aurora must show that it obtained the stock by "operation of law." We address each possibility in turn.

■ Because Aurora was not a shareholder at the time of the allegedly wrongful transaction, it does not have standing under the first rule 23.1 alternative. Aurora obtained its interest in the LWD stock in November of 1991, after the Ogden property was sold and after XM acquired its interest. Restaurant Co. purchased the Ogden property at a sheriff's sale on May 15, 1991. Restaurant Co. then transferred its interest in the property to XM on May 20, 1991. The six-month period available for LWD to redeem the property expired on November 15, 1991. Aurora purchased the Hogle judgment on November 21, 1991. Thus, the earliest time that Aurora could claim any interest in Hogle's LWD stock was six days *after* the expiration of the redemption period. This does not suffice.

■ Furthermore, because Aurora cannot show that it obtained its shares by "operation of law," it does not have standing under the second rule 23.1 alternative. " 'Operation of law' means that the shares come to the transferee without any act or cooperation on [its] part." *South End Improvement Group, Inc. v. Mulliken,* 602 So.2d 1327, 1331 (Fla.Dist. Ct.App.1992); *see also Black's Law Dictionary* 1092 (6th ed.1990) (defining "operation of law" as transfer that occurs "by the mere application to the particular transaction of the established rules of law, without the act or co-operation of the party [it]self"); *Dawson v. Dawson,* 645 S.W.2d 120, 126 (Mo.Ct. App.1982). For example, the "operation of law" concept has frequently applied in "situations where a plaintiff has acquired title as a result of rights obtained through a will." *Kaplus v. First Continental Corp.,* 711 So.2d 108, 111 (Fla.Dist.Ct.App.1998). In this case, Aurora obtained its interest in the stock after it purchased Hogle's judgment from the FDIC. Because the purchase was an affirmative action, requiring Aurora's cooperation and participation, Aurora did not obtain its interest in the shares by operation of law.

Nonetheless, Aurora argues that it has standing under two exceptions to the contemporaneous ownership doctrine—the con-

tinuing wrong exception and the fraudulent concealment exception. We address each contention in turn.

■ Aurora first argues that Gay and XM engaged in a continuing wrong by converting the Ogden property to Gay's own use through a drawn-out scheme that continued until after the date on which Aurora acquired its interest in the Hogle stock.

> [The] "continuing wrong" exception to the contemporaneous [ownership] rule allows one who acquired his stock after the transaction of which he complained to maintain a derivative suit on the theory that the alleged "wrong" commenced before the stock acquisition but was continuing and *not executed and final* until sometime after the plaintiff acquired his stock.

*Brambles USA, Inc. v. Blocker*, 731 F.Supp. 643, 649 (D.Del.1990) (emphasis added); *see also Saylor v. Bastedo*, 78 F.R.D. 150, 152–53 (S.D.N.Y.1978) ("The exception applies to a shareholder acquiring an interest in a corporation injured by a plan commenced before the date of share acquisition but not fully executed until afterward."). Thus, the continuing wrong exception applies only when the wrongful activity "continues to place in jeopardy of loss the corporation on behalf of which the would-be plaintiff seeks redress." *Saylor*, 78 F.R.D. at 153.

In this case, Aurora argues that the 1995 recording of the quit-claim deed from Restaurant Co. to XM, which occurred long after Aurora acquired its interest, constituted a continuing part of a scheme to defraud Aurora. We disagree. The continuing wrong exception does not apply in this case because the alleged wrongful activity was final before Aurora obtained its interest in the Hogle stock. The redemption period on the Ogden property expired on November 15, 1991, before Aurora had any interest in LWD's stock.

On that date, the loss to the corporation became final. The later recording of the quit-claim deed added nothing to the transaction insofar as LWD's rights were concerned.[3]

■ Aurora also argues that it has standing under the "fraudulent concealment exception" to the contemporaneous ownership doctrine. The fraudulent concealment doctrine originated as an equitable doctrine to estop one who has prevented discovery of a cause of action by wrongfully concealing a material fact from asserting a statute of limitations defense to the assertion of the claim. *See* 51 Am.Jur.2d *Limitation of Actions* § 147 (1970). This court has applied the doctrine in the statute of limitations context to estop a wrongdoer from benefitting from concealing his wrong. *See, e.g., Berenda v. Langford*, 914 P.2d 45, 51 (Utah 1996). However, we have never applied the doctrine to effect an exception to the contemporaneous ownership rule. That being the case, we see no reason why the estoppel rationale underlying the doctrine cannot also apply to the contemporaneous ownership rule. We turn to our case law to flesh out its elements and application in the contemporaneous ownership context. We will then apply it to the facts before us.

In *Berenda v. Langford*, we acknowledged that the statute of limitations on a cause of action begins to run when the plaintiff has sufficient information to put him or her on notice to inquire further if he or she has questions about the defendant's conduct. 914 P.2d at 51 (citing *United Park City Mines Co. v. Greater Park City Co.*, 870 P.2d 880, 889 (Utah 1993)). However, we further explained that the statute of limitations is tolled when the plaintiff shows (i) that the defendant took affirmative steps to conceal the plaintiff's cause of action and (ii) that "given the defendant's actions, a reasonable

---

**3.** Aurora argues that the continuing harm is Gay's breach of fiduciary duty and, therefore, the harm was not final until Gay misappropriated LWD's sole asset. Even if Gay breached his fiduciary duties by misappropriating corporate assets, for purposes of the continuing wrong exception, the harm to the corporation became final when it lost the Ogden property. Although subsequent conduct by Gay may have affected his status or that of another corporation, these alleged acts had no effect on LWD's status. Put simply, when LWD lost the Ogden property, it could lose no more; therefore, no subsequent act could cause LWD any more harm.

plaintiff would not have discovered the claim earlier." *Id.* We stated that the application of the fraudulent concealment doctrine, a legal rule, to any specific set of facts, "is necessarily a matter left to trial courts and finders of fact." *Id.* at 53. For that reason, we recognize that summary judgment would be appropriate only if the case presented one of two factual scenarios. Specifically, summary judgment would be appropriate only if (i) "the facts are so clear that reasonable persons could not disagree about the underlying facts or about the application of the governing legal standard to the facts or" (ii) "the facts underlying the allegation of fraudulent concealment are so tenuous, vague, or insufficiently established that they fail to raise a genuine issue of material fact as to concealment." *Id.* at 54.

■ Because the considerations underlying the doctrine are the same in both the case of a statute of limitations and the contemporaneous ownership rule, the same standard should govern both situations. Therefore, following the reasoning of *Berenda,* we will allow a noncontemporaneous shareholder to bring a derivative suit if he or she can show (i) that the corporation fraudulently concealed wrongdoing from shareholders [4] and (ii) that a reasonable shareholder would not have discovered the wrongdoing earlier.

■ In this case, the court below granted partial summary judgment in LWD's favor, concluding that Aurora lacked standing because it did not own any LWD stock at the time of the alleged wrong. The trial court, however, did not explain why it thought summary judgment was appropriate, given the fraudulent concealment exception to the contemporaneous ownership rule. On appeal, LWD contends that summary judgment was properly granted. It argues that even if a disputed issue of fact exists regarding whether it affirmatively concealed the fact that it no longer owned the asset, that factual dispute is immaterial because the sheriff's sale certificate recorded with the Weber County

Recorder gave Aurora, as a matter of law, notice of LWD's alleged wrongdoing before it purchased the Hogle judgment. We disagree.

■ LWD has not demonstrated that even if it took affirmative steps to conceal wrongdoing, it is entitled to judgment as a matter of law—that is, it has not shown that despite affirmative concealment of its having disposed of the asset, a reasonable person would nonetheless have discovered the wrongdoing, in this case, before purchasing the Hogle judgment. As to this latter point, we recognize that documents duly recorded according to the real estate title of the Utah Code impart constructive notice to all persons of their contents. *See First Am. Title Ins. Co. v. J.B. Ranch, Inc.,* 966 P.2d 834, 837 (Utah 1998). However, recording statutes "are intended to protect those having subsequent dealings with the property" and "impute[ ] notice only to those who are bound to search for it." *Romero v. Sanchez,* 83 N.M. 358, 492 P.2d 140, 144 (N.M.1971); *see also Besett v. Basnett,* 389 So.2d 995, 998 (Fla.1980); *Letellier v. Small,* 400 A.2d 371, 377 (Me.1979); *Dreckshage v. Community Fed. Sav. & Loan Assoc.,* 555 S.W.2d 314, 320 (Mo.1977). We decline to hold at this time that a reasonable person purchasing a judgment secured by stock in a company is bound to investigate the ownership status of the company's assets after the company represented that it still owned the assets at issue. Instead, the finder of fact must determine whether, given the particular circumstances, a reasonable person would have researched the property's title record.

We next determine whether the trial court erred in dismissing Aurora's direct claims against Gay and XM. When reviewing a trial court's grant of a motion to dismiss, "we accept the factual allegations in the complaint as true and consider them and all reasonable inferences to be drawn from them in a light most favorable to the plaintiff." *Russell v. Standard Corp.,* 898 P.2d 263, 264

---

4. The shareholders seeking to bring a derivative action under the fraudulent concealment exception must not have benefitted from the improper actions.

(Utah 1995); Utah R. Civ. P. 12(b). We will affirm a motion to dismiss "only when it is apparent that as a matter of law, the plaintiff could not recover under the facts alleged." *Harmon City, Inc. v. Nielsen & Senior,* 907 P.2d 1162, 1167 (Utah 1995).

Aurora argues that the trial court erred in dismissing its direct claims against Gay and XM for negligent mismanagement, breach of fiduciary duties, waste of corporate assets, and appropriation of corporate opportunities because shareholders in a closely held corporation may bring directly claims which are by nature derivative. LWD counters that the trial court did not err in dismissing the direct claims because rule 23.1 and our case law require Aurora to bring a derivative action for an alleged injury to the corporation. We first briefly address the differences between direct and derivative actions.

■■■■ Derivative suits "'are those which seek to enforce any right which belongs to the corporation.'" *Richardson v. Arizona Fuels Corp.,* 614 P.2d 636, 639 (Utah 1980) (citation omitted). Actions alleging mismanagement, breach of fiduciary duties, and appropriation or waste of corporate opportunities and assets generally belong to the corporation, and therefore, a shareholder must bring such actions on its behalf. *See id.* at 639–40; *Morris v. Ogden State Bank,* 84 Utah 127, 28 P.2d 138, 143 (1934). Moreover, even though wrongdoing or fraud of corporate officers may indirectly injure shareholders, shareholders generally cannot sue directly for those injuries. *See Richardson,* 614 P.2d at 639–40. In contrast are direct actions by shareholders.

> "[I]f the injury is one to the plaintiff as a stockholder and to him individually, and not to the corporation, as where the action is based on contract to which he is a party, or on a right belonging severally to him, or on a fraud affecting him directly, it is an individual action."

*Id.* at 639 (quoting 13 Fletcher, *Cyclopedia of the Law of Private Corporations* § 5911 (1970)). Put differently, in a direct action, the plaintiff can prevail without showing an injury to the corporation—the shareholder need show only an injury to him- or herself that is distinct from that suffered by the corporation. *See Principles of Corporate Governance: Analysis and Recommendations* § 7.01 cmt. c (American Law Inst. 1994).

Returning to the present case, Aurora acknowledges that the claims it asserts against LWD, XM, and Gay all involve alleged mismanagement of LWD by Gay, LWD's CEO. Under the rules described above, these claims are derivative and cannot be brought directly. Aurora urges us to apply a rule allowing a minority shareholder of a closely held corporation like LWD to proceed both directly and derivatively against majority or controlling shareholders for breaching fiduciary duties owed to both the corporation and the minority shareholder.

■■ There is a growing trend to allow minority shareholders of a closely held corporation to proceed directly against majority shareholders. For example, the American Law Institute has proposed:

> In the case of a closely held corporation ... the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.

*Principles of Corporate Governance: Analysis and Recommendations* § 7.01(d). We recognize that the rationale for requiring an action to proceed derivatively is often absent in a closely held corporation, where it is unlikely that there is a disinterested board because the majority shareholders are often the corporation's managers. *See id.* cmt. e. As well, "the concept of a corporate injury that is distinct from any injury to the shareholders approaches the fictional in the case of

a firm with only a handful of shareholders." *Id.* We therefore hold that a court may allow a minority shareholder in a closely held corporation to proceed directly against corporate officers.

 However, permitting a shareholder to proceed directly for claims against a closely held corporation does not exempt the shareholder from the contemporaneous ownership rule of rule 23.1, although it would exempt the minority shareholder from many of the procedural requirements of a derivative action, such as the requirement to make demand on the corporation and to obtain court approval before voluntarily dismissing or settling an action. Rule 23.1, in essence, is a standing rule. The rationale of the rule assumes that the purchaser who becomes an owner after the occurrence of wrongful corporate conduct paid a price for the stock reflecting that misdeed and that, therefore, the purchaser suffers no injury from the wrongful conduct. This assumption is equally as true for the purchaser of stock in a closely held corporation as in a large publicly traded corporation. But just as a noncontemporaneous shareholder may proceed with a derivative action by showing that one of the exceptions to the contemporaneous ownership rule applies, so we hold that a minority, noncontemporaneous shareholder may proceed directly for corporate wrongdoing if the shareholder can show that one of the exceptions applies. Having concluded that Aurora should be allowed to show that an exception to the contemporaneous ownership rule applies for purposes of its derivative claim, we similarly conclude that Aurora may proceed directly if it can prove that one of the exceptions applies.

We now turn to Aurora's final argument. Aurora contends that the trial court erred in denying its motion to amend. On January 2, 1996, after the trial court held that the contemporaneous ownership doctrine barred Aurora's derivative claims, Aurora moved to amend the complaint to add claims based on fraud.[5] The trial court denied the motion in

a minute entry which simply stated, "The motion to Amend the Complaint is denied." It did not offer any explanation for its denial.

 Rule 15(a) of the Utah Rules of Civil Procedure governs motions to amend. It provides that once a party files a responsive pleading, the other "party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Utah R. Civ. P. 15(a). In reviewing a trial court's denial of a motion to amend, we will affirm the denial unless the trial court abused its discretion. *See, e.g., R & R Energies v. Mother Earth Indus.,* 936 P.2d 1068, 1080 (Utah 1997). But the discretion given a trial judge is not unlimited. In applying the federal counterpart to Utah's rule 15(a), the United States Supreme Court stated:

> Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also Parks v. Macro–Dynamics, Inc.,* 121 Ariz. 517, 591 P.2d 1005, 1008 (Ariz.Ct.App.1979) ("It is an abuse of discretion to deny a motion for leave to amend without reason."). The Idaho Supreme Court, operating under a parallel rule, has held that "a district court's refusal to grant leave to amend without any justifying reason is, per se, an abuse of discretion." *Idaho Sch. for Equal Educ. Opportunity v. Idaho State Bd. of Educ.,* 128 Idaho 276, 912 P.2d 644, 652 (1996) (finding abuse of discretion where trial court denied motion in one-paragraph order without analysis or reasoning). When a trial court summarily denies a motion to amend, this court has no basis upon which we can determine whether it abused its discretion.

---

**5.** Aurora filed two motions to amend its complaint, both of which the trial court denied. It is

the denial of the latter motion that Aurora challenges on appeal.

Where no reason is assigned as grounds for the denial of a motion to amend a pleading, this Court has no guide whereby it can determine if a trial court has abused its discretion. This Court is then left in a dilemma wherein reversible error becomes a possibility if not a probability even though the trial court's reasoning might have been a proper exercise of its judicial discretion.

*Price v. Price,* 430 So.2d 848, 849–50 (Miss. 1983). Nonetheless, when a trial court fails to state a reason for its denial of a motion to amend, it does not necessarily abuse its discretion if the reason for denial is apparent. *See Pallottino v. City of Rio Rancho,* 31 F.3d 1023, 1027 (10th Cir.1994). In this case, the reason for denial is not apparent.

■ In deciding on a motion to amend, the trial court should primarily consider whether granting the motion would subject the opposing party to unavoidable prejudice "by having an issue adjudicated for which he had not had time to prepare." *Bekins Bar V Ranch v. Huth,* 664 P.2d 455, 464 (Utah 1983). In this case, Aurora seeks to amend its complaint to state an alternative theory of recovery. Where the amendment would advance a new theory of recovery based almost entirely on facts already in evidence, the court should liberally allow amendment because the opposing party is then generally prepared to address such a claim. *See Foman,* 371 U.S. at 182, 83 S.Ct. 227 (allowing amendment where "the amendment would have done no more than state an alternative theory for recovery"). *But see Pallottino,* 31 F.3d at 1027 ("A busy district court need not allow itself to be imposed upon by the presentation of theories seriatim."). In so stating, however, we recognize that many other factors, such as delay, bad faith, or futility of the amendment, may weigh against the trial court's allowing amendment.[6] Although the record before us does not suggest that such opposing factors are present in this case, the trial court must ultimately assess all the factors on remand to determine if leave to amend is appropriate.

In conclusion, we reverse the trial court's partial grant of summary judgment on Aurora's derivative claims, its dismissal of Aurora's direct claims alleging corporate mismanagement, and its denial of Aurora's motion to amend, and remand for further proceedings.

Chief Justice HOWE, Associate Chief Justice DURHAM, Justice STEWART, and Justice RUSSON concur in Justice ZIMMERMAN's opinion.

recovery under a fraud theory. From the record before us, we do not believe that the trial court has already decided this issue.

---

6. LWD argues that the court did not abuse its discretion because the court had already decided the issues Aurora sought to include on amendment. We disagree. Aurora now wants to seek