¶ 1 Jerome Arndt and the other plaintiffs below (collectively "the plaintiffs") appeal an order and judgment granting the defendants' (collectively "First Interstate Bank of Utah, N.A." or the "Bank") motion for judgment on the pleadings. The trial court held that the *Page 585 
plaintiffs' claims were derivative in nature and that the plaintiffs could not pursue such claims in their individual capacities. We affirm.
 ¶ 2 When reviewing a grant of a motion for judgment on the pleadings, this court accepts the factual allegations in the complaint as true; we then consider such allegations "and all reasonable inferences drawn therefrom in a light most favorable to the plaintiff." Golding v. Ashley Cent. Irr. Co., 793 P.2d 897, 898
(Utah 1990). "[W]e affirm the grant of such motion only if, as a matter of law, the plaintiff could not recover under the facts alleged." Id.
 FACTS ¶ 3 Beginning in 1975, Spence Clark and Clark Financial Group (collectively "Clark") began soliciting investments in multiple limited partnerships in which Clark was the general partner. The private offering memoranda and partnership agreements ("POMs") connected with these partnerships indicated that each partnership was related to a specific real estate project and that, upon the sale of the real property, the partnership involved would immediately dissolve and liquidation would take place. The accounts for all the partnerships were controlled by Clark and were maintained at the Bank. However, Clark also maintained a "Pooled Income Fund" account (the "Fund") with the Bank, through which Clark diverted funds from the dissolved limited partnerships to subsidize less prosperous ventures.
 ¶ 4 Although some of the POMs discussed the Fund, they did not fully disclose the nature and purpose of the Fund or that it would be used to aggregate the various limited partnerships' sales proceeds. Although many of the involved properties were sold, none of the plaintiffs received their full distributions from the sales because Clark had diverted the proceeds using the Fund.
 ¶ 5 The plaintiffs brought this action against the Bank, claiming that it knowingly or negligently allowed Clark to divert partnership proceeds to the Fund. The first amended complaint stated causes of action against the Bank for negligence, breach of fiduciary duty, and breach of covenant of good faith and fair dealing, and a cause of action for damages to plaintiffs as third-party beneficiaries of the agreements between the Bank and the general partner. The Bank moved to dismiss the complaint, and although the trial court initially denied that motion, it later amended its ruling and gave the plaintiffs "twenty days to amend their amended complaint to plead a derivative claim in conformity with the Utah rules." The plaintiffs filed a second amended complaint, maintaining that their claims "are not derivative in nature, inasmuch as the limited partnerships in question have been dissolved" and "[e]ach individual plaintiff has been personally damaged as a result of the defendants' conduct."
 ¶ 6 The Bank subsequently filed a motion for judgment on the pleadings, arguing that because the partnerships involved had not yet been terminated, any cause of action for damages in connection with the mismanagement of the partnerships belongs to the partnerships and not to the limited partners individually. The district court agreed and dismissed the plaintiffs' complaint with prejudice.
 ¶ 7 On appeal, plaintiffs assert two claims of error. First, plaintiffs argue that this court's rationale in Aurora CreditServices, Inc. v. Liberty West Development, Inc., 970 P.2d 1273
(Utah 1998), provides for individual causes of action under the facts of this case. Second, plaintiffs contend that because the partnerships here automatically dissolved upon sale of the real estate assets, there remain no partnerships on whose behalf the appellants may derivatively sue the wrongdoers. We address these arguments in reverse order.
 ANALYSIS I. DISSOLUTION VERSUS TERMINATION OF LIMITED PARTNERSHIP ¶ 8 Plaintiffs argue that even if the causes of action set forth in their petition are derivative in nature, they should be able to pursue the claims in their individual capacities because the partnerships involved were dissolved immediately upon sale of each partnership's *Page 586 
real estate, and therefore none of the partnerships continue to exist as entities capable of bringing suit. We disagree.
 ¶ 9 Utah law provides that the parties to a partnership may, through agreement, designate those events upon which dissolution or termination shall occur. There is no dispute here that under the POMs, the dissolution of each partnership was to occur immediately upon the sale of that partnership's real estate, and that liquidation of the partnership would then follow. The question is whether a dissolved partnership, prior to the completion of liquidation, remains an entity capable of bringing suit. The partnership agreements in this case apparently do not address this question, and we look therefore to statutory law.
 ¶ 10 The Utah Revised Uniform Limited Partnership Act (the "URULPA"), Utah Code Ann. §§ 48-2a-101 to -1107 (1998), sets forth the provisions governing limited partnerships in Utah. In reviewing the URULPA, we apply the traditional rules of statutory construction. "A fundamental rule of statutory construction is that statutes are to be construed according to their plain language." O'Keefe v. Utah State Retirement Bd., 956 P.2d 279, 281
(Utah 1998). "Only if the language of a statute is ambiguous do we resort to other modes of construction." Id. One such mode is reading the statute "in harmony with other statutes under the same and related chapters" and "rely[ing] on the plain language of [those related] statutes [in which] no ambiguity exists." Bonhamv. Morgan, 788 P.2d 497, 500 (Utah 1989); see also Roberts v.Erickson, 851 P.2d 643, 644 (Utah 1993); Provo City Corp. v.State, 795 P.2d 1120, 1123 (Utah 1990).
 ¶ 11 We begin with section 48-2a-801, which provides, in relevant part, that "[a] limited partnership is dissolved and its affairs shallbe wound up upon the happening of the first to occur of the following: . . . (2) upon the happening of events specified in writing in the partnership agreement. . . ." Utah Code Ann. § 48-2a-801 (emphasis added). The language of this statute — the verb tenses used, in particular — indicate that dissolution of a partnership is an event distinct and separate from its winding up, with the winding up process taking place subsequent to dissolution.
 ¶ 12 The URULPA does not itself define "dissolution" or "winding up."See id. §§ 48-2a-101 to -1107. The Uniform Partnership Act (the "UPA"), however, provides some guidance. See id. § 48-2a-1105
(providing that, "[i]n any case not provided for in this chapter the provisions of Title 48, Chapter 1, Uniform Partnership Act, govern"); see also id. § 48-1-3(3) (1998) ("This chapter shall apply to limited partnerships except in so far as the statutes relating to such partnerships are inconsistent herewith."). The UPA defines "dissolution" as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on, as distinguished from the winding up, of the business." Id. § 48-1-26. Section 48-1-27 provides that "[o]n dissolution a partnership is not terminated, but continues until the winding up of partnership affairs is completed." Id. § 48-1-27
(emphasis added).
 ¶ 13 Unfortunately, "winding up" is not defined in either the URULPA or the UPA. See id. §§ 48-1-1 to 48-2a-1105. However, we believe it is appropriate to examine related statutes — such as the Revised Business Corporation Act (the "RBCA") — for further guidance. See,e.g., Bonham, 788 P.2d at 500; Roberts, 851 P.2d at 644; ProvoCity Corp., 795 P.2d at 1123. Section 16-10a-1405 of the RBCA, provides, in relevant part:
 (1) A dissolved corporation continues its corporate existence but may not carry on any business except that appropriate to wind up and liquidate its business and affairs, including:
(a) collecting its assets;
 (b) disposing of its properties that will not be distributed in kind to its shareholders;
. . .
 (e) doing every other act necessary to wind up and liquidate its business and affairs.
(2) Dissolution of a corporation does not:
. . . *Page 587 
 (e) prevent commencement of a proceeding by or against the corporation in its corporate name.
Utah Code Ann. § 16-10a-1405 (1995).
 ¶ 14 In this case, each of the partnerships dissolved upon the sale of its respective real estate. However, as section 48-2a-801
contemplates, the partnerships continued in existence after dissolution for the purpose of winding up their business. See id.
§ 48-2a-801 (stating that "[a] limited partnership is dissolved and its affairs shall be wound up upon the happening of the first to occur of the following . . ." (emphasis added)); see also id.
§ 48-1-27 ("On dissolution a partnership is not terminated, but continues until the winding up of partnership affairs is completed."). Cf. Cheves v. Williams, No. 950404, slip op. at ¶¶ 27-29 (Utah, Sept. 10, 1999). Because we see no reason why corporate principles related to "winding down" are not appropriate in the limited partnership context, and because the RBCA specifically provides that dissolution of a corporation does not "prevent commencement of a proceeding by or against the corporation in its corporate name," id. § 16-10a-1405(2)(e), we hold that, to the extent necessary during the winding up process, a partnership retains the ability to sue and be sued. Seealso Grossman v. Davis, 34 Cal.Rptr.2d 355, 357 (Ct.App. 1994) ("The idea that winding up a legal partnership's unfinished business may require the filing of new litigation is not a novelty."); Baker v. Rushing, 409 S.E.2d 108, 113 (N.C.Ct.App. 1991) ("A partnership's legal existence continues during the winding up of its affairs, and the partnership and partners can sue and be sued for the enforcement of the partnership's rights and obligations.").
 ¶ 15 Thus, we reject the plaintiffs' argument that they should be able to pursue their claims individually against the Bank solely because the partnerships involved were dissolved prior to commencement of this suit.
 II. DERIVATIVE VERSUS INDIVIDUAL CAUSES OF ACTION ¶ 16 Plaintiffs also argue that the rationale of our recent decision inAurora Credit Services, Inc. v. Liberty West Development, Inc.,970 P.2d 1273 (Utah 1998), in which we recognized that shareholders in a closely-held corporation may have individual causes of action against other shareholders and/or corporate officers under certain circumstances, applies to the limited partners under the facts of this case. The Bank, however, contends that Aurora Credit is not applicable and that the traditional rules concerning derivative actions in the corporate context apply equally to limited partnerships.
 ¶ 17 Whether principles of corporate law distinguishing derivative actions from individual actions apply to limited partnerships is a question of first impression in Utah. If Aurora Credit is not determinative, we must examine Utah statutory law and the case law from other jurisdictions for guidance.
 ¶ 18 In Aurora Credit, a minority shareholder of LWD, a closely-held corporation with four shareholders, brought both derivative and direct claims against the corporation and its majority shareholder, alleging negligent and intentional mismanagement of the corporation, breach of fiduciary duties, and waste of corporate assets. Aurora Credit had acquired its status as a minority shareholder after purchasing an assignment of a judgment against one of the shareholders, James Hogle, Jr., as security for which Hogle had pledged his shares of the LWD stock. Both prior to the assignment and thereafter, LWD represented to Aurora Credit that it owned and was trying to sell certain property located in Ogden, Utah. Aurora Credit was never notified that the property was subsequently levied on by a third party to satisfy a judgment against LWD for nonpayment on a contract, or that the property was sold at a sheriff's sale to the same third party and then almost immediately resold to XM International (a general partnership owned jointly by LWD's majority shareholder and another party). Still, it was not until approximately two years later that the majority shareholder informed Aurora Credit that LWD no longer owned the property.
 ¶ 19 In holding that Aurora Credit could pursue its direct claims against LWD and *Page 588 
the majority shareholder, this court reiterated that "[a]ctions alleging mismanagement, breach of fiduciary duties, and appropriation or waste of corporate opportunities and assets generally belong to the corporation," and that shareholders bringing such actions must do so derivatively.Id. at 1280. In contrast, "in a direct action, the plaintiff can prevail without showing an injury to the corporation — the shareholder need show only an injury to him- or herself that is distinct from that suffered by the corporation." Id.
 ¶ 20 We also noted, however, that "[t]here is a growing trend to allow minority shareholders of a closely held corporation to proceed directly against majority shareholders" because "`the concept of a corporate injury that is distinct from any injury to the shareholders approaches the fictional in the case of a firm with only a handful of shareholders.'" Id. at 1280-81 (quotingPrinciples of Corporate Governance: Analysis and Recommendations, American Law Institute, § 7.01(d) cmt. e). However, we also held that such direct action may be appropriate only if the deciding court determines that allowance of the direct action will not
 "(I) unfairly expose the corporation or defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons."
Id. at 1280 (quoting Principles of Corporate Governance at § 7.01(d) cmt. e).
 ¶ 21 In applying these principles in Aurora Credit, we noted that the plaintiff there was not necessarily alleging an injury common to all LWD shareholders. Rather, Aurora Credit's claims rested ultimately on LWD's and the majority shareholder's misrepresentations to Aurora Credit concerning the status of the property held by LWD and the majority shareholder's apparent manipulation of the property's transfer so as to retain the value of the property while extinguishing Aurora Credit's interest in it. The injury alleged in Aurora Credit was suffered uniquely by Aurora Credit and therefore was much more direct than is a typical derivative claim. Cf. Hames v. Cravens, 966 S.W.2d 244, 248 (Ark. 1998) (discussing direct claims of shareholders of closely held corporations and noting that "exceptions" to derivative action requirements "are actually independent actions to redress injuries suffered primarily by the shareholder and secondarily, if at all, by the corporation"); Landstrom v. Shaver, 561 N.W.2d 1, 13 (S.D. 1997).
 ¶ 22 Applying the Aurora Credit analysis to the claims in this action, we conclude that they lack the distinctive qualities necessary to remove them from the category of derivative claims. The very fact that plaintiffs are pursuing their claims in a class action suggests that the injuries suffered stem only from the claimants' non-particularized interests in their respective partnerships, which interests have been affected uniformly by the fraudulent activity of the general partner, which in turn has led to the decreased value of each of the partnerships and ultimately to the decreased value of each partner's share. Clearly, then, it is each individual partnership that has experienced the direct injury; the individual's losses are indirect and contingent.
 ¶ 23 Furthermore, we cannot agree with plaintiffs that pursuit of their claims individually will not (1) unfairly expose the Bank to a multiplicity of actions, (2) materially prejudice the interests of other potential partnership creditors, or (3) interfere with a fair distribution of the recovery among all interested persons.See Aurora Credit, 970 P.2d at 1280.
 ¶ 24 Having concluded that Aurora Credit's analysis does not resolve this case, we move to the question of whether it is appropriate to apply corporate principles concerning derivative actions to limited partnerships. We conclude that it is.
 ¶ 25 The URULPA itself recognizes the existence of derivative causes of action in the limited partnership context. Section 48-2a-1001 of the URULPA specifically provides that "[a] limited partner may bring an action in the right of a limited partnership. Utah Code Ann. § 48-2a-1001 (emphasis added); see also R.S. Ellsworth, Inc.v. Amfac Fin. Corp., 652 P.2d 1114, 1116-17 (Haw. 1982) (discussing history of limited partnership derivative action under Uniform Limited *Page 589 
Partnership Act). This language is almost identical to the language used to identify derivative actions in the corporate context. See
Utah Code Ann. § 16-10a-740 (defining action as one "brought in the right of a corporation"). It seems reasonable, then, to infer that the same principles apply to define derivative actions in the limited partnership context as in the corporate. See7547 Corp. v. Parker Parsley Dev. Partners, 38 F.3d 211,221 (5th Cir. 1994) (noting fact that Texas has statute expressly allowing limited partners to sue derivatively on behalf of the partnership--"thus making their status more equivalent to that of a shareholder — leads us to believe that a Texas court would likely be hesitant to allow a limited partner . . . to sue directly for wrongs suffered in reality by the partnership").
 ¶ 26 Other jurisdictions have reached the same conclusion. See, e.g.,Golden Tee v. Venture Golf Sch., 969 S.W.2d 625, 629 (Ark. 1998) ("In ascertaining whether a cause of action [involving a limited partnership] is derivative, it is appropriate to look to corporate law for guidance."); Caley Inv. I v. Walters, 754 P.2d 793, 796
(Colo.Ct.App. 1988) (discussing pleading requirements for derivative actions against corporations and holding that pleading requirements for derivative actions against limited partnerships serve the same purpose); Litman v. Prudential-Bache Properties,Inc., 611 A.2d 12, 15 (Del.Ch. 1992) (stating that "determination of whether a fiduciary duty lawsuit is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases"); Northern Trust v. VIII South Mich.Assoc., 657 N.E.2d 1095, 1101 (Ill.App.Ct. 1995) (discussing conditions under which shareholder must proceed by means of derivative suit and stating that "[l]imited partners are in the same position as shareholders"); Strain v. Seven Hills Associates,429 N.Y.S.2d 424, 431 (App.Div. 1980) ("In determining whether a cause of action is derivative in nature regarding limited partnership law, the case law relevant to corporation law may be looked to for guidance."); Caplener v. United States Nat'l Bank,857 P.2d 830, 836 (Or. 1993) (stating that "key issue is not whether the claim is by a corporation, a shareholder, or a partner, but whether the claimed damages were derivative of, rather than distinct from, a breach of the agreement with the borrowing corporation or partnership"); Mallia v. Painewebber,Inc., 889 F. Supp. 277, 282 (S.D. Tex. 1995). Cf. Larson v. FirstInterstate Bank, 786 P.2d 1176, 1179-81 (Mont. 1990).
 ¶ 27 Plaintiffs argue, however, that, even if such a rule is appropriate in most cases, this court should fashion an exception to the rule when, as here, the partnerships involved automatically dissolved upon the sale of the partnerships' assets. Plaintiffs rely particularly on the cases of Whalen v. Carter, 954 F.2d 1087
(5th Cir. 1992), and Gagan v. American Cablevision, Inc.,77 F.3d 951 (7th Cir. 1996), to support their argument. However, we conclude that neither of those cases is persuasive or applicable here.
 ¶ 28 In Whalen, the United States Court of Appeals for the Fifth Circuit concluded that, under Louisiana law, limited partners could bring a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-68 (1988), directly against certain other partners and their alleged co-conspirators, despite the fact that "the defendants' racketeering activity was directed against the partnership, . . . and that the plaintiffs' injuries derived from injuries to the partnership." See954 F.2d at 1093-94. The court noted that the general rule in Louisiana is "that as long as a partnership exists and has not been dissolved or liquidated, the partnership itself is the proper party to maintain an action for damages to the partnership." Id. at 1093. However, the court also noted that Louisiana has recognized several exceptions to that rule, including an exception providing that "when the injury to the partnership is caused by a partner, the disaffected partners can sue the partner that caused the injury." Id. We conclude that adoption of such a rule in Utah would virtually dissolve any distinction between derivative and direct actions based on breach of fiduciary duty, mismanagement, etc., in the limited partnership context, despite the fact that these are the very actions traditionally defined as actions that must be brought derivatively. See Richardson v. *Page 590 Arizona Fuels Corp., 614 P.2d 636, 639 (Utah 1980). We also conclude that the blanket adoption of such a rule would ignore the concerns justifying derivative actions that we addressed in Aurora Credit--that direct suits could expose defendants to a multiplicity of actions, that direct suits could materially prejudice the interests of other potential partnership creditors, and that direct suits could interfere with a fair distribution of the recovery among all interested persons.
 ¶ 29 Gagan also involved a RICO claim. In deciding that a limited partner had standing to bring such a claim against other partners, the United States Court of Appeals for the Seventh Circuit concluded (1) that "cases dealing with RICO claims brought by shareholders are inapposite"; (2) that the partnership had been dissolved at the time of the suit; and (3) that Arizona law provided "no basis for Gagan to bring suit on behalf of a dissolved limited partnership." Gagan 77 F.3d at 959. We need not address the Seventh Circuit's conclusion that RICO claims brought by shareholders are inapposite in determining whether a limited partner has the right to bring a direct claim against other partners. We also need not determine whether the Seventh Circuit correctly interpreted Arizona law in concluding that Arizona law provided no basis for Gagan to bring a derivative suit on behalf of the dissolved partnership. We have concluded above that, under Utah law, a dissolved partnership retains the right to sue and that rules concerning derivative versus direct actions remain applicable to limited partnerships at least until the winding up process for the partnerships is completed. Thus, unlike under Arizona law, as interpreted by the Seventh Circuit, derivative claims remain viable in Utah even after the partnership has been dissolved. Therefore, Gagan does not help the appellants to establish their standing to pursue their claims directly against the Bank here.
 ¶ 30 We conclude that the partnerships in question in this lawsuit continued to exist for winding up purposes after the automatic dissolution triggered by the sale of their assets. We also conclude that the same principles used to define derivative actions for corporations are applicable to limited partnerships. The plaintiffs were therefore required to pursue the partnership claims in derivative proceedings.
 ¶ 31 Affirmed.
 ¶ 32 Chief Justice HOWE, Justice STEWART, Justice ZIMMERMAN, and Justice RUSSON concur in Associate Chief Justice DURHAM'S opinion.